[Cite as *State v. Bendolph*, 2018-Ohio-1729.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27534 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-4043 |
| | : | |
| NEEDOM BENDOLPH | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of May, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

ANDREW C. SCHLUETER, Atty. Reg. No. 0086701, P.O. Box 96, Xenia, Ohio 45385
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1}  Needom Bendolph was found guilty by a jury of two counts of rape by force and one count of felonious assault; he was sentenced to an aggregate prison term of 11 years, was designated as a Tier III sex offender, and was ordered to pay restitution. Bendolph appeals from his conviction, arguing that his trial counsel was ineffective in presenting the testimony of an expert witness without fully investigating what the content of her testimony would be and appreciating its impact on his defense.

{¶ 2}  For the following reasons, the judgment of the trial court will be affirmed.

### Facts and Procedural History

{¶ 3}  On January 16, 2017, Bendolph was indicted on two counts of rape (by force) and one count of felonious assault (serious harm).  The complainant was Bendolph's girlfriend, L.G.  Bendolph filed a motion to suppress evidence, which was overruled.  He did not waive his right to a speedy trial.  He was tried by a jury on March 20 and 21, 2017, and was found guilty of all of the offenses.  The court sentenced him as described above.

### The State's Case

{¶ 4} The State's evidence at trial was as follows:

{¶ 5} On December 28, 2016, L.G. and Bendolph were out in the evening with some friends; L.G. was the designated driver, and she was driving someone else's car for most of the evening.  Her own car was at Bendolph's mother's apartment, where the couple sometimes stayed.  Later in the evening, she and Bendolph were dropped off at the apartment, got into her car, and went out a while longer.  When they returned to the apartment, L.G. was driving, and Bendolph was in the passenger seat; L.G. was planning

to drop Bendolph off and go to her sister's for the night.

{¶ 6}  According to L.G., when she pulled into the driveway alongside Bendolph's mother's apartment, Bendolph suddenly grabbed her car keys and began hitting her with his fists.  She "call[ed] his name and he wasn't responding to [her]," and she "was begging him to stop."  In the struggle, their positions became reversed, such that Bendolph was on the driver's side of the car, standing outside the door, and L.G. was half in and half out of the driver's door, lying back on the passenger seat.

{¶ 7}  Bendolph pulled L.G.'s legs toward the driver's side door and partially ripped her pants and underwear.  L.G. testified that he then put his hand inside her vagina, removed it, smelled and licked his hand, and said, "[B]***h, I know you been f***ing."[1] He then performed cunnilingus on L.G., spit "all over" her, "then took out his penis and shoved it in [her]."  L.G. testified that she was telling him to stop, kicking, and fighting the entire time.  Bendolph was choking her, calling her names, and threatening to kill her.

{¶ 8}  After a few minutes, L.G. managed to lean her body up against the car's horn in an effort to draw attention.  Several neighbors came outside.  When Bendolph noticed that people were outside, he "drug" L.G. out of the car, closing her coat because "her pants and things was all exposed," and led her to the door of his mother's apartment by the back of her neck.  After Bendolph banged on the door and window for a few minutes, his mother let them into her apartment, which was on the second floor.

{¶ 9}  According to L.G., Bendolph led her up the stairs, whispering in her ear threats to kill her and telling her to be quiet, "but he was talking normal to his mother"

---

[1] Because our opinions are widely available online, we have chosen to insert asterisks into certain offensive words that appear in the transcript of this case and in other cases.

about spending the night. Bendolph led L.G. into a back bedroom, where she sat in a chair while Bendolph went to talk with his mother in another room. Bendolph's mother also came into the bedroom and talked with L.G. "for a minute." Bendolph then closed the bedroom door, pulled L.G.'s hair, and threw her onto the bed. He "started performing oral sex on [her] again at this time," "tore [her] underwear off completely," put his penis in L.G.'s mouth while threatening to kill her if she bit him, and then put his penis in her vagina again. Bendolph did not ejaculate.

**{¶ 10}** L.G. testified that she and Bendolph "were interrupted" by a knock at the front door. Bendolph's mother answered the door, and Bendolph's brother, Floyd, entered the apartment. Bendolph briefly left the bedroom and talked with Floyd, who then followed him back into the bedroom. After greeting L.G., Floyd began to question her about what was wrong. Floyd learned that Bendolph had hit L.G., and an altercation between the two men ensued. L.G. saw an opportunity to get away and headed for the apartment door, although Bendolph still had her car keys and purse.

**{¶ 11}** Bendolph pulled L.G. back into the apartment by her hair; she sat down "on the couch, in the living room, still exposed." The two men then went down the stairs and outside the apartment building. Bendolph returned, "screaming and yelling," threatening to kill Floyd and to "get a gun." L.G. tried to calm Bendolph down, but Bendolph said, "b***h, you're the reason," and slapped her so hard that she "fell off the couch" and "[saw] stars." When she was on the ground, Bendolph "started stomping and kicking [her] and sitting on [her]." Bendolph's mother attempted to intervene on L.G.'s behalf, telling Bendolph "don't put your hands on that girl."

**{¶ 12}** Bendolph again left the apartment. L.G. got back on the couch and asked

Bendolph's mother to call the police. Bendolph's mother agreed and said that she was calling the police and an ambulance. However, before any help arrived, L.G. heard her car start outside the apartment. She tried to run out to the car, but fell down the steps. When she got outside, the "car [was] taking off," but she grabbed the handle and got in. She explained that her "entire life was in that car. Everything [she] had worked for, everything [she] owned. All of my music, microphones – he had my money, he had my purse. My entire life was pulling out of that driveway and my instinct was to protect it, so I got in the car."

{¶ 13} In the car, Bendolph was still "ranting" about killing his brother; L.G. tried to "appease" him and calm him down. Bendolph was driving erratically. They stopped at a night club they had visited earlier in the evening with their friends. Bendolph ordered L.G. out of the car, but she was crying and said that she could not get out because she "ha[d] no clothes on" and was "exposed." Bendolph threatened to beat her with a club (the type that keeps a steering wheel locked) that was under the seat of the car.

{¶ 14} L.G. agreed to get out and "started easing over from the passenger seat to the driver's seat"; she was attempting to pull the keys out of the car ignition. Bendolph, who had not been wearing a shirt, apparently stepped out of the car and put the club between his legs while he put on a shirt. At that point, L.G. "put that car in reverse and got the hell out of there," knocking Bendolph to the ground in the process. She drove to a nearby gas station, where a patron and a gas station employee called the police. L.G. testified that she was bleeding and "completely exposed," so she waited in her car for the police to arrive.

{¶ 15} The police took L.G. to the hospital, where a sexual assault kit was

completed. L.G. testified that she had "quite a few knots" on the back of her head, four fractures of the "orbital floor" of her left eye, and a lot of cuts and bruises. She testified that the doctors were hoping the bones around her eye would heal without surgery, but that the healing was going slowly and was "a little more complicated" because she was a diabetic. She testified at trial that she still suffered blurred vision, bad headaches, and had trouble with her vision for nighttime driving.

{¶ 16} L.G. was cross-examined at length about various details of her testimony, but the cross-examination did not suggest the nature of the defense that Bendolph intended to pursue.

{¶ 17} Montgomery County Sheriff's Deputy Darren Harvey responded to the gas station across the street from the night club on December 28, 2016. He found L.G. "crying hysterically" with her pants "ripped open"; he could barely understand what she was saying. She reported that she was physically assaulted and raped by her boyfriend, who was at a nearby nightclub. Another deputy responded to the night club and arrested Bendolph. L.G.'s ripped underwear was found by sheriff's deputies in the bedroom of Bendolph's mother's apartment.

{¶ 18} The nurse who conducted the sexual assault exam testified at trial that she observed injuries to L.G.'s face and left eye. She testified that L.G. "complained of some discomfort" during the vaginal exam, but no tears, abrasions, or bruising were observed; the nurse testified that such findings were not uncommon in women of child-bearing age, because estrogen makes the woman's vagina "elastic" and "less likely to have any injuries." During the interview and examination, L.G. reported vaginal penetration with penis and fingers, contact of the assailant's mouth to the patient's genitals, that she had

been "kissed, licked or bitten" on her neck, and that no ejaculation had occurred. When asked about the use of lubrication, L.G. stated that her assailant had "spit all over her." The nurse swabbed various areas of L.G.'s body, based on her description of the incident.

{¶ 19} The State also called Bendolph's mother ("Mother"), who testified about calling the police around 1:30 a.m. on December 28, 2016, about an incident between her son and L.G. She testified that they had come into her apartment and had been in the back bedroom quietly and "peaceful" while she watched television. Then Floyd arrived, and Mother told him that Bendolph was back in the bedroom. The men were "laughing and talking for a minute," then a "scuffle" began "because [Floyd] was asking [Bendolph] what — what did he do – what did he do to her or something." Mother had not "pa[id] any attention to" L.G. up to that point, in terms of noticing any injuries. After the altercation with Floyd, in the living room, Bendolph "jumped on [L.G.]," "hit her a couple times," and "us[ed] his feet." Mother became angry, told Bendolph to leave L.G. alone, and called the police. Mother testified that L.G. had been crying, but Mother had not observed any injuries; Mother did not recall telling the police that she had heard Bendolph and L.G. fighting in the bedroom.

{¶ 20} Montgomery County Sheriff's Detective Brian Conley investigated L.G.'s assault. He testified that he spoke with Mother about the incident, and Mother stated that she had heard "screaming" from the back bedroom when Bendolph and L.G. were in the apartment; this was consistent with what Mother had told officers "on the scene." She also stated that her son had left the apartment with L.G.'s purse.

*The Defense Case and the Surprise Evidence*

{¶ 21} The defense called two witnesses: Amy Dallaire, a forensic scientist in the

"serology DNA section" of the Miami Valley Regional Crime Lab, and Bendolph.

**{¶ 22}** Dallaire had worked on the sexual assault kit in the Bendolph case. After providing some background about the manner in which samples are marked and tracked, Dallaire testified that she had examined the vaginal swabs in the sexual assault kit for the presence of semen. She stated that the first step is an "acid phosphatase test" for the presence of semen; if that test is positive, she does further testing. In Bendolph's case, the acid phosphatase test was negative. However, she did another "confirmatory" test, which looked for sperm cells or protein, "because sometimes vaginal fluid can kind of dilute out the [acid phosphatase] reaction"; she further testified, without objection, that she "looked for sperm cells and found them. So the vaginal swabs were positive for semen."

**{¶ 23}** Dallaire then explained in some detail her testing procedures for obtaining a sample of DNA from the swabs and obtaining a DNA profile. She explained that, once the profile was determined, an "unknown" DNA sample on a swab from a sexual assault kit could be compared to a "standard" (DNA obtained from a known individual, in this case, Bendolph).

**{¶ 24}** She was then asked by defense counsel:

Q: And I think you – did you find that there was – in your findings in regard to the presence of DNA?

A: Where I did DNA on the vaginal swabs and the standards from [L.G.] and Needom Bendolph, the result I got from the vaginal swabs is no foreign DNA was identified on the vaginal swabs.

Q: And so (indiscernible) so that means there's – you found no

DNA of someone other than [L.G.]?

A:     Right.

Q:     Okay. And did you – in your findings there, did you – did you
include that in a – in a report?

A:     Yes, I did.

**{¶ 25}** Dallaire was then presented with her DNA report, Exhibit A.  Defense counsel asked if this report included all of her findings "generated as a part of [her] examination" of the evidence in this case.   She responded that the DNA report included only her DNA findings; she also had "a separate report for the serology findings."

**{¶ 26}** At this point, the prosecutor asked if the attorneys could approach the bench.   Defense counsel responded, "yes, please."   At sidebar, the court noted "complete surprise" on counsels' faces, and both attorneys indicated that they had been aware of only one report – the DNA report indicating no presence of foreign DNA – which they had received the previous week.   Neither attorney had been aware of or had seen Dallaire's serology report.   The court excused the jury, had additional discussions with counsel about the serology and DNA reports, and allowed the parties to question Dallaire. Defense counsel stated that he had had no notice of the serology report and "may have changed the manner of questioning Ms. Dallaire" if he had known of it.   Defense counsel requested a mistrial.

**{¶ 27}** On further questioning outside the presence of the jury, Dallaire testified that, once a report is "released from our building, I have no control over who it gets released to."   In other words, she did not know to whom her reports had been provided. She created the serology report as a matter of her usual procedures, and was not

specifically requested by anyone to do so. She stated that the serology report had been released in January 2017, more than two months before trial.

{¶ 28} After a short break, the parties reconvened in chambers and the court heard arguments on Bendolph's motion for a mistrial. The court observed that "it was clear from the reaction of all counsel, that this was a complete surprise that she [Dallaire] was going to say that." Defense counsel stated that he had been assured by the State that he had received all discovery material. He had called Dallaire to the stand based on the DNA report, had talked with her briefly about the DNA report on the Friday before trial, and had "anticipated nothing else." Further, defense counsel stated, "I would not have put her on the stand to testify that there was semen in the vaginal swab. And that totally undercuts a theory of the defense case, a strategic move that defense would have made; perhaps even calling her as a witness to begin with." (Although counsel did not explain what this theory was or how it was "undercut," the defendant would later testify that he and L.G. had not had any sexual relations on the night in question.) Finally, defense counsel expressed his belief that the prejudice suffered as a result of the surprise could not be cured by any instruction to the jury.

{¶ 29} The State argued that it had asked the lab "to send over all the labs that they had in regards to this case," and that the lab responded by emailing only the DNA report. The prosecutor stated that Detective Conley had also been unaware that there was a serology report separate from the DNA report. The State provided the DNA report to the defense as soon as it was available. The State also pointed out that Dallaire was called as a defense witness, not a State's witness, that defense counsel had "equal opportunity to discuss this" with Dallaire, that defense counsel acknowledged that he had

discussed the DNA report with Dallaire before trial, and that defense counsel could have asked Dallaire if there were any additional reports. Since both parties were unaware of the report, the State asserted that "the fault does not lie with us." Finally, the State argued that "[w]e don't know whose [semen] it is," and that exploration of this topic would be "blocked by rape shield."

{¶ 30} The State proposed a continuance for additional DNA testing to be conducted on the semen, but the defense objected, saying that "it would totally disrupt the flow of the trial, our strategy throughout the trial. * * * [I]t's completely taken a left turn in the middle of trial and I think that would be unduly prejudicial."

{¶ 31} The trial court overruled the motion for a mistrial. It cited several factors: 1) the surprise was not clearly apparent to the jury; 2) Dallaire was called as a defense witness, and the defense had an obligation to know what its witness's testimony would be; 3) there was no prosecutorial misconduct, in that the State was also unaware of the report and did not intentionally withhold it; 4) *Brady* protects a defendant from the withholding of inculpatory evidence and, because additional testing of the semen "could have been inculpatory," the exclusion of the serology report arguably favored the defendant; 5) the defense could still argue that no DNA was found, which was the original basis of the defense; 6) because the contributor of the semen is unknown, any argument that it was the semen of someone else would violate the rape shield law; and 7) the undisclosed report was not "overly prejudicial" and could be cured by telling the jury to disregard the testimony of the witness in regard to the serology report.

{¶ 32} The court instructed the jury that it was "to totally disregard the testimony of [Dallaire] regarding any serology testing or report that may be generated."

{¶ 33} After Dallaire's testimony, Bendolph testified on his own behalf. He testified that he and L.G. had drifted apart because of her "addiction," but that he was giving her one more chance after they moved to Dayton from Texas. He further testified that he had a bad headache when he and L.G. returned to his mother's apartment on the night in question, and that he simply laid down in the bedroom with L.G. and tried to sleep; he denied having any physical altercation with L.G. or having sex with her that night. On cross-examination, he testified that L.G. "was trying to do a bunch of other stuff * * * [s]exually," "like pay attention to her, touch her," but that he was "totally ignoring her." He did not recall whether her clothes were on or off, because it was dark.

{¶ 34} When Floyd arrived, the men "had words" and a physical altercation; Bendolph denied that the altercation was related to his having hit L.G. Bendolph then chased Floyd out of the apartment. When Bendolph came back into the apartment a short time later, L.G. was in the living room, and he took her car keys to chase Floyd. L.G. came along voluntarily. Bendolph stated that he "never noticed anything" such as marks or scratches on L.G.'s face.

{¶ 35} According to Bendolph, when he and L.G. arrived at the night club in pursuit of Floyd, as he stood by the car door, L.G. backed the car up, hit him with the door, and pulled away.

{¶ 36} Bendolph raises one assignment of error on appeal, which challenges the effectiveness of his trial counsel, based on counsel's handling of the preparation for the testimony of the serologist and of her surprise statements at trial.

### Ineffective Assistance of Counsel

{¶ 37} To establish ineffective assistance of counsel, a defendant must

demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is also entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 689.

**{¶ 38}** Bendolph claims that he was denied effective assistance of counsel, because his attorney failed to investigate Dallaire's testimony before trial. Specifically, he asserts that counsel should have investigated whether "the favorable conclusion of the DNA report" (that Bendolph's DNA was not found to be present on the victim) excluded the possibility that there was semen present in the vagina. Bendolph argues that "reasonable pretrial investigation" and asking "appropriate questions" would have prevented the surprise at trial, and that Dallaire's testimony might have permitted the jury to conclude that Bendolph was the source of the semen notwithstanding the lack of foreign DNA. He argues that the presence of semen undermined his theory of the case and suggested that L.G. had sex with someone around the time of the offenses, which was prejudicial to his defense.

**{¶ 39}** Defense counsel had briefly interviewed Dallaire in the days before trial,

but their conversation did not uncover the existence of a second report or the serologist's finding that semen was present. Defense counsel acknowledged that his conversation with Dallaire before trial was brief, and both parties acknowledge that the DNA report became available to them only two or three days before trial. Defense counsel did not further elaborate on the nature or scope of his pretrial discussion with Dallaire.

{¶ 40} Without more, and given that counsel did not know that another report existed, we cannot conclude that a thorough discussion of the DNA report with Dallaire would necessarily have revealed the existence of the second report and thus led defense counsel to not call Dallaire as a witness. For strategic reasons, defense counsel may not have disclosed to Dallaire the nature of the defense he intended to pursue, such that Dallaire may have pointed out the additional evidence contained in the serology report. Under the circumstances presented on this record, and with our very limited knowledge of counsel's conversation with Dallaire, we cannot conclude that defense counsel's performance fell below an objective standard of reasonableness, was prejudicial, and was ineffective.

{¶ 41} Moreover, although we recognize that the due process clause of the Fourteenth Amendment to the United States Constitution imposes upon the State a duty to disclose to a criminal defendant evidence that is favorable to him or her and is material either to guilt or to punishment, we cannot find that Bendolph was denied due process.

{¶ 42} In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that a criminal defendant may claim denial of due process where the state fails to disclose the existence of potentially exculpatory evidence; the failure to disclose evidence favorable to an accused violates due process where the

evidence is material either to guilt or to punishment. *Id.*, 373 U.S. at 86. "Exculpatory evidence * * * is defined as 'evidence favorable to the accused which, if disclosed and used effectively, * * * may make the difference between conviction and an acquittal.' " *State v. Whalen*, 9th Dist. Lorain No. 08CA009317, 2008-Ohio-6739, ¶ 8, citing *State v. Rowe,* 92 Ohio App.3d 652, 666, 637 N.E.2d 29 (10th Dist. 1993) and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence must be both favorable and material before disclosure is required, and favorable evidence under *Brady* encompasses both exculpatory and impeachment evidence. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 338, citing *Brady* at 87 and *Bagley* at 674*.*

{¶ 43} Material evidence is that which goes to "the *substance* of the allegations" against a defendant, i.e., evidence the defendant would have used to acquit himself of the specific charges levied against him. (Emphasis sic.) *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 13; *see also State v. Beavers*, 2d Dist. Montgomery No. 26036, 2015-Ohio-1161, ¶ 41. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *State v. Iacona*, 93 Ohio St.3d 83, 89, 752 N.E.2d 937 (2001). *State v. Johnston,* 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus, following *Bagley.*

{¶ 44} Material evidence differs from "potentially useful evidence," which is "evidence of limited exculpatory value" that does not bear directly upon an accused's guilt or innocence. *State v. Jackson,* 9th Dist. Summit No. 28625, 2018-Ohio-19, ¶ 27.

{¶ 45} The question is whether, in the absence of the undisclosed evidence, the

defendant received a fair trial, i.e., a trial resulting in a verdict worthy of confidence; the analysis is not based on the likelihood of a different verdict. *See, e.g., State v. Bai*, 12th Dist. Butler No. CA2010-05-116, 2011-Ohio-2206, ¶ 67, citing *State v.Goff*, 12th Dist. Clinton No. CA2000-05-014, 2001 WL 208845, *4 (March 5, 2001) and *Kyles v. Whitley,* 514 U.S. 419, 434-435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that one does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict).

**{¶ 46}** The defendant bears the burden of proving that evidence was materially exculpatory. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 102; *Iacona* at 92.

**{¶ 47}** It is apparent that Bendolph called Dallaire to testify believing that her testimony would be somewhat helpful to him; he believed she would testify, as she did, that there was no DNA evidence that Bendolph had engaged in sexual activity with L.G. However, she also testified that, although no foreign DNA was found, semen was present. (The trial court instructed the jury a short time later to disregard this testimony.) At the time this evidence was revealed, Bendolph had not yet testified at trial to his version of events — specifically, that he had not engaged in any sexual activity with the victim on the night in question; he testified later the same day.

**{¶ 48}** Without more, the undisclosed serology report and its conclusion that semen was present on the victim was neither exculpatory nor inculpatory. If this evidence had been known to the parties, Bendolph might have presented a defense that

he and L.G. had engaged in consensual sexual intercourse or that L.G. had other sexual partners, while the State would likely have argued that it was further evidence of the rape.[2] Because the trial court prohibited further questioning about the serology testing and results (due to the non-disclosure of the report), it is not apparent that additional testing would or could have produced more information about the source of the semen, especially in light of Dallaire's testimony that she found no foreign DNA.

{¶ 49} Even if we were to view the serology report as favorable or exculpatory, which we do not, the non-disclosure of this evidence did not necessarily implicate due process. The Due Process Clause may or may not be implicated, depending whether the evidence is disclosed "in time for its effective use at trial" and whether the timing of the disclosure otherwise "significantly impairs the fairness of the trial." *Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001), citing *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir.1985); *see also State v. Wickline*, 50 Ohio St.3d 114, 116, 552 N.E.2d 913 (1990).

{¶ 50} Here, Bendolph's counsel's opening statement contained general statements that the jury should "keep in mind" the presumption of innocence and the burden of proof, and should separate emotion from fact in the testimony of the witnesses. His cross-examination of L.G. sought only to confirm the details of her testimony. Neither the opening statement nor the cross-examination of the complainant or other witnesses suggested what the defense theory of the case would be or whether the defense would present an alternate version of events. In other words, Bendolph had not yet set forth or

---

[2] This argument assumes that such evidence would have been admissible under R.C. 2907.02(D) and other evidentiary rules, without so holding.

even suggested the version of events to which he subsequently testified, i.e., that he had not had sexual intercourse with the victim on the night in question because he had a headache.

{¶ 51} Moreover, the court instructed the jury to disregard Dallaire's testimony about the serology report (and therefore, the presence of the semen). We generally presume that a jury will follow the court's curative instructions concerning the evidence that may be considered, and for what purpose. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 93; *State v. Herring*, 94 Ohio St.3d 246, 254, 762 N.E.2d 940 (2002). We have no reason not to indulge that presumption in this case.

{¶ 52} Under these circumstances, where the undisclosed evidence was not known to the prosecution and was not necessarily favorable or unfavorable to the defendant and the trial court instructed the jury to disregard the one reference to it, where there was strong evidence of guilt, and where evidence of the absence of foreign DNA was admitted, we cannot conclude that the surprise caused by the undisclosed report "significantly impair[ed] the fairness of the trial" and violated Bendolph's rights under the due process clause and *Brady*.

{¶ 53} The assignment of error is overruled.

{¶ 54} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Mathias H. Heck
Andrew T. French
Andrew C. Schlueter

Hon. Dennis J. Adkins