[Cite as *State v. Singleton*, 2016-Ohio-5443.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   26889 |
| | : | |
| v. | : | T.C. NO. 15CR846 |
| | : | |
| CHARLES F. SINGLETON | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___19th__ day of ____August___, 2016.

. . . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162 and ANN M. GRABER, Atty. Reg. No. 0091731, Assistant Prosecuting Attorneys, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorneys for Plaintiff-Appellee

KATE L. BOWLING, Atty. Reg. No. 0084442, 2521 Far Hills Avenue, Dayton, Ohio 45419
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Charles F. Singleton was convicted after a jury trial in the Montgomery County Court of Common Pleas of rape (by force or threat of force) and unlawful sexual conduct with a minor.   The offenses merged for sentencing, and the trial court imposed

eleven years in prison for the rape. The judgment entry further indicated that Singleton was designated a Tier III sex offender for the rape and a Tier II sex offender for unlawful sexual conduct with a minor.

**{¶ 2}** Singleton appeals from his convictions. He challenges the trial court's denial of his motion to suppress the statements he made to the police and its admission of alleged hearsay at trial. He also claims that his conviction for rape was against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

### I. Motion to Suppress

**{¶ 3}** Singleton's first assignment of error claims that the trial court erred in denying his motion to suppress. The suppression hearing was limited to whether Singleton's statements to police at the police station were made in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**{¶ 4}** In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

**{¶ 5}** Under the Fifth Amendment to the United States Constitution, no person shall

be compelled to be a witness against himself or herself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda* have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21. To counteract the coercive pressure of custodial interrogations, police officers must warn a suspect, prior to questioning, that he or she has a right to remain silent and a right to the presence of an attorney. *Maryland v. Shatzer*, 559 U.S. 98, 103-104, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), citing *Miranda*, 384 U.S. at 444. "After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present." *Shatzer* at 104.

**{¶ 6}** A defendant may waive his or her *Miranda* rights. *Id.* However, in order for a defendant's statements made during a custodial interrogation to be admissible, the State must establish that the accused knowingly, voluntarily, and intelligently waived his or her rights. *Miranda*, *supra*; *State v. Edwards*, 49 Ohio St.2d 31, 38, 358 N.E.2d 1051 (1976), *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

**{¶ 7}** Singleton was interviewed by Detective Elizabeth Alley on March 17, 2015, beginning at 2:11 p.m., in a police station interview room. The evidence at the suppression hearing consisted of a DVD recording of that interview (State's Exhibit 1) and a waiver of rights form signed by Singleton at the beginning of the interview (State's Exhibit 2).

**{¶ 8}** At the beginning of the interview, Detective Alley introduced herself and another detective who was present in the interview room, and she informed Singleton that

she needed to read him his *Miranda* rights. Alley asked Singleton if he had ever been read his rights before, and he responded that he had. Alley wrote "Yes" on the top of a waiver of rights form.

**{¶ 9}** Detective Alley presented Singleton with the waiver of rights form, and she asked him to write his name, birthdate, and Social Security number on the top left of the form. Alley wrote the date, time, location of the interview, and alleged offense on the form.

**{¶ 10}** The waiver of rights form had five enumerated statements, which read:

1. You have the right to remain silent. You do not have to make any statements or answer any questions.

2. Anything you say can and will be used against you in a Court of Law.

3. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

4. If you do not have the money to hire a lawyer, a lawyer appointed by the Court, or a lawyer from the Public Defender's Office, will be provided to you before and during questioning without any cost to you.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

**{¶ 11}** Detective Alley read each of the five statements of rights to Singleton. After each one, she asked him if he understood what the statement meant, and Singleton answered that he did. Alley asked Singleton to initial next to each statement. She told Singleton that, by initialing, he was indicating that he understood "that right and that right

alone." Singleton initialed next to each statement after it was read to him, and he expressed his understanding.

{¶ 12} Detective Alley asked Singleton about the number of years of schooling that he had completed. Singleton indicated that he had completed eight years, and Alley asked him to write "8" on the form. Alley asked where he went to school, and Singleton responded, "Chicago." Alley asked Singleton to write "Chicago" on the form; Singleton did so, but spelled it incorrectly. Alley next asked if Singleton could read. He responded that he could not read well. When Alley asked Singleton to read the "Waiver of Rights" paragraph on the form aloud, he attempted to do so, but had significant difficulty and needed substantial assistance from Alley.

{¶ 13} After Singleton attempted to read the "Waiver of Rights" paragraph, Detective Alley read the entire paragraph to him again, and she reviewed the five statements of rights that they had gone over before. Alley explained each sentence in the "Waiver of Rights" paragraph. Alley asked Singleton to sign at the bottom of the form if he was willing to talk to her. Singleton signed the bottom of the form.

{¶ 14} After completing the waiver of rights form, Alley asked for and obtained a DNA sample from Singleton, and she spoke with Singleton about himself and the allegations against him. Singleton responded clearly and appropriately to Alley's questions and those posed by the other detective in the room. When confronted with the allegations against him, Singleton repeatedly denied any wrongdoing and provided an alternative version of events. The DVD recording ends at 3:00 p.m., while the interview was ongoing. The suppression hearing transcript does not reflect when the interview concluded.

{¶ 15} At the suppression hearing, defense counsel argued that Singleton lacked the ability to understand the *Miranda* warnings and that his waiver of those rights was not knowing, intelligent, and voluntary. Counsel emphasized Singleton's inability to read and his misspelling of Chicago.

{¶ 16} The trial court denied Singleton's motion. In doing so, the court described Detective Alley's actions in reviewing Singleton's *Miranda* rights with him, and the court found that Singleton "neither indicated nor demonstrated any difficulty in understanding the rights that were read and explained to him by the officer." The trial court found that Singleton "understood what he was told" and that he knowingly, intelligently, and voluntarily waived his *Miranda* rights, his reading impediment notwithstanding.

{¶ 17} We agree with the trial court's conclusions. Detective Alley orally reviewed each of the five discreet *Miranda* rights on the waiver form with Singleton. Singleton acknowledged his understanding of those rights and initialed next to each statement after doing so. In reviewing the "Waiver of Rights" paragraph, Alley again reviewed the five rights to ensure that Singleton understood what he was waiving. When Singleton was unable to read the "Waiver of Rights" paragraph himself, Detective Alley read the paragraph to him and explained each sentence in the paragraph in simpler terms. Singleton expressed that he understood the "Waiver of Rights" paragraph and that he was willing to waive his rights, and he signed the bottom of the form to indicate his waiver. Although Singleton's attempt to read the "Waiver of Rights" paragraph reflected his difficulties in reading, Singleton's subsequent oral responses to the detectives' questions were cogent and concise, and there is no indication that Singleton was unable to understand the orally-explained waiver of rights form.

{¶ **18**} Singleton's first assignment of error is overruled.

## II. Manifest Weight of the Evidence

{¶ **19**}  In his third assignment of error, Singleton claims that his conviction for rape was against the manifest weight of the evidence, because there was no evidence that he used force.

{¶ **20**} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."  *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12.  *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion").  When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ **21**} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses.  *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).  However, we may determine which of several competing inferences suggested by the evidence should be preferred.  *Id.*  The fact that the

evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 22} Singleton was convicted of rape, in violation of R.C. 2907.02(A)(2). That statute provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 23} The State's evidence at trial established that Singleton was an employee of the United Theological Seminary and Church in Dayton. The building houses several churches, including Leap of Faith Church. Singleton staffed the front desk of the church, assisted patrons, performed maintenance, and locked up after church services were completed. A.M.'s mother, who attended Leap of Faith Church, referred to Singleton as a security guard.

{¶ 24} On March 15, 2015, fourteen-year-old A.M. went to United Theological Seminary and Church to attend church with her mother. At that time, A.M. lived with her father and stepmother, and she had told her father, stepmother, and her friend, P.B., that she was going to church. A.M. did not contact her mother to say that she (A.M.) planned to meet her (mother) at church. Unknown to A.M., A.M.'s mother was at a church event out of town.

{¶ 25} When A.M. entered the church, Singleton was at the front desk. A.M. recognized Singleton from her prior church attendance. In the past, Singleton had given her a couple of dollars on her birthday, and he had provided her and her mother a ride home on occasion, when A.M.'s mother asked for a ride. A.M. did not know Singleton

outside of church.

**{¶ 26}** A.M. asked Singleton if her mother was there, and Singleton informed her that her mother was not at church that day. They talked for about 10 minutes. Singleton told A.M. that he was going to take her home, and he instructed her to go into a nearby room to wait while he locked up the church. A.M. went into a room with picnic tables that had checkerboards on them. She waited for approximately 10 to 15 minutes and played with Jenga pieces in a red bucket.

**{¶ 27}** When Singleton entered the room, he told A.M. to pull down her pants. A.M. refused. Singleton again told her to pull down her pants, using a "deeper" voice. A.M. again said, "No." Singleton told her a third time to pull down her pants, using a loud, deeper voice. (On cross-examination, A.M. indicated that a deep voice and a yell were the same to her.) A.M. testified that she was scared and thought he was going to hit her; she complied with his demand.

**{¶ 28}** A.M. stated that Singleton "turned me around and like he pushed my back in like he had his hand on my back. And then he tried to stick [his] penis in me." A.M. clarified that Singleton made her bend over, but he was unable to penetrate her vagina. A.M. further testified that Singleton then "picked me up and then he put me on the table. * * * And then he got on top of me. And then he put his penis inside my vagina." Singleton told A.M., "I've been waiting a long time for this." Singleton ejaculated inside and on A.M., and he went into the kitchen and retrieved a red and white rag for A.M. to use to wipe herself. A.M. wiped herself off and pulled up her pants.

**{¶ 29}** Singleton walked out of the room, and A.M. left the room soon after. When Singleton saw her in the lobby, he handed her $2. Singleton asked A.M. if she was going

to tell anyone, and she said no. A.M. walked out of the church.

{¶ 30} As A.M. crossed the church's parking lot, Singleton drove up beside her and told her to get in so he could take her home. A.M. responded that she was going to a friend's house. Singleton drove off, and A.M. crossed the street to a library, where she used the Wi-Fi to contact her friend, P.B., using Facebook messaging. A.M. messaged her friend that she was scared and had "just got * * * raped * * * by the man at the church." A.M. went to P.B.'s house, where they contacted A.M.'s stepmother. The stepmother called an ambulance, which took A.M. to the hospital.

{¶ 31} The police spoke with A.M. at the hospital and investigated the complaint. At the church, the police located the room described by A.M., and a red and white rag was found in a trashcan nearby. At the hospital, a sexual assault nurse examiner ("SANE nurse") completed a rape kit, which included taking vaginal and rectal swabs and a swab of a dried stain on A.M.'s mons pubis area. Singleton's DNA was found on the vaginal swab, the partial DNA profile found on the mons pubis swab was consistent with Singleton's DNA, and Singleton's and A.M.'s DNA could not be excluded as contributors to the mixed DNA profile located on the rag. On March 18, A.M. reviewed a photo array and identified Singleton as the man who had raped her.

{¶ 32} Singleton presented no evidence on his own behalf.

{¶ 33} On appeal, Singleton argues that the jury's conclusion that he had used force or threat of force was against the manifest weight of the evidence. He asserts that "[t]he simple act of 'bending' a female over a table, or 'flipping her onto her back', as was testified to, without evidence of lack of consent cannot in and of itself be considered force necessary to establish rape." Singleton states that a lack of consent is a prerequisite to

the use of force.

{¶ 34} R.C. 2901.01(A)(1) defines "force" as any "violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." We recently discussed proof of force, stating:

It has been recognized that proof of physical violence or physical resistance is not required to establish Rape if the defendant creates in the mind of the victim the belief that physical force will be used if the victim does not submit. "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established."

State v. Hartman, 2016-Ohio-2883, __ N.E.3d __, ¶ 28 (2d Dist.).

{¶ 35} In the case before us, A.M.'s testimony established that her will was overcome by fear and duress. At the time of the sexual assault, A.M. was fourteen years old; Singleton was 49 years old. A.M. was familiar with Singleton as the man who sat at the front desk at the church, but she did not otherwise have a relationship with him. A.M. testified that she was waiting for Singleton, who had offered her a ride home. When Singleton came into the room where she was waiting, he repeatedly told her to remove her pants. A.M. refused twice, but she testified that his voice became progressively "deeper" and louder. She stated that she complied with his third demand, because she was "scared" and "thought he was going to like hit me." With respect to the use of force,

A.M. testified that Singleton turned her around, pushed her on her back, and bent her over, and tried to penetrate her vaginally with his penis. He then picked A.M. up, put her on the table, got on top of her, and penetrated her vaginally. A.M. testified that it hurt.

{¶ 36} Given the discrepancy in age between A.M., a minor, and Singleton and their lack of relationship, as well as A.M.'s testimony regarding his demands that she remove her pants, her fearfulness, and his conduct of pushing her, bending her over, and putting her on the table, we cannot conclude that the jury lost its way in concluding that Singleton purposely compelled A.M. to submit to sexual conduct by force or threat of force.

{¶ 37} Singleton's third assignment of error is overruled.

### III. Admission of Hearsay Statements

{¶ 38} In his second assignment of error, Singleton claims that the "trial court erred in admitting multiple hearsay statements." Specifically, Singleton asserts that the court should have excluded photographs of A.M.'s Facebook messages to her friend, P.B., regarding the rape. He claims that the entire conversation was inadmissible hearsay, and that both A.M.'s and P.B.'s statements should have been excluded.

{¶ 39} A.M. testified twice about her Facebook conversation with P.B during her (A.M.'s) direct examination. After describing the sexual assault and her subsequent conversation with Singleton in the church parking lot, A.M. testified that she went to the library across the street from the church and sent P.B. a Facebook message. She testified, without objection, as follows:

Q: Okay. And when you sent [P.B.] a message, was it another Facebook message like before?

A: (No audible response)

Q: Okay. And you said you told you needed to talk to her?

A: Yes.

Q: Okay, and did you tell her why or did you tell her what happened?

A: No, I told her I was scared.

Q: Okay. And how did you feel at that time?

A: Scared.

Q: Okay. How long between when you left the church to when you got over and started the message to [P.B.]?

A: It wasn't long.

Q: Okay.

A: Like only right across the street.

Q: Okay. And did you tell her what had happened inside the church?

A: Yeah.

Q: Okay. And do you remember what words you used?

A: I told her I had got raped.

Q: Okay. And did you tell her by who?

A: The man at the church.

Q: Okay. And what happened next when you told her that, what happened next?

A: She said come on over. And I went over there and I called my -- she called my stepmom, then I talked to my stepmom.

Q: Okay.

A:    Then my stepmom came up to the church.

(Trial Tr. 269-270.)   A.M. then testified about what occurred after being taken to the hospital, and she described her meeting with Detective Alley at CARE House the following day.

{¶ 40} At this juncture, the prosecutor asked A.M. to look at various photographs, starting with photographs of the church facility.   Before the prosecutor asked A.M. to look at photographs showing the Facebook messages between A.M. and P.B., defense counsel objected.   Defense counsel stated that "the witness has testified that she sent Facebook messages.   She testified what the content of the messages were to her friend [P.B.].   I believe this evidence is merely cumulative evidence and I'd object to it[.]"   Defense counsel did not object on hearsay grounds.   The State nevertheless responded that the photographs were admissible under the excited utterance and present sense impression exceptions to the hearsay rule.   The trial court overruled defense counsel's objection and concluded that the conversation was admissible under exceptions to the hearsay rule.

{¶ 41} Defense counsel also objected to P.B.'s Facebook responses to A.M.   The prosecutor argued that P.B.'s statements were not offered for the truth of the matter and were not hearsay.   The trial court allowed P.B.'s statements, as well.

{¶ 42} Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."   A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by him as an assertion.   Evid.R. 801(A).   In general, hearsay is not admissible.   Evid.R. 802.

However, there are several exceptions to the hearsay rule.

{¶ 43} Evid.R. 803(1) permits the admission of a "present sense impression," which is defined as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Similarly, Evid.R. 803(2) excludes an excited utterance from the hearsay rule. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶ 44} The excited utterance and present sense impression exceptions to the definition of hearsay reflect "an assumption that statements or perceptions that describe events uttered during or within a short time from the occurrence of the event are more trustworthy than statements not uttered at or near the time of the event. Moreover, the key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter. By making the statement at the time of the event or shortly thereafter, the minimal lapse of time between the event and statement reflects an insufficient period to reflect on the event perceived — a fact which obviously detracts from the statement's trustworthiness." (Internal citations omitted.) *State v. Crowley*, 2d Dist. Clark No. 2009 CA 65, 2009-Ohio-6689, citing *State v. Travis*, 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237, ¶ 35 (2d Dist.).

{¶ 45} At trial, Singleton did not object to the admission of the photographs of the Facebook messages between A.M. and P.B. on hearsay grounds. Accordingly, we review Singleton's challenge to the admission of those messages for plain error. In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and

the error must have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 46} We find no error, plain or otherwise, in the trial court's admission of the photographs of the Facebook messages between A.M. and P.B. The record indicates that A.M. sent the messages to P.B. shortly after she was sexually assaulted, and the library from which she sent the messages was across the street from the church. A.M. testified that she was feeling scared when she sent the messages, and the messages themselves indicate that she felt like she was going to cry. The trial court reasonably concluded that the messages from A.M. were admissible as either excited utterances or present sense impressions.

{¶ 47} The court also properly allowed P.B.'s responses to A.M. Most of P.B.'s responses to A.M. were questions, which did not make any assertions. For example, when A.M. messaged that she had to tell P.B. something and that she (A.M.) was about to cry, P.B. responded, "What is it." A.M. then asked P.B. if she could come over, to which P.B. responded, "Why can't u just type it." P.B.'s additional responses to A.M. -- which told A.M. to call her, asked A.M. who had raped her (A.M.), asked A.M. if she was "for real," and telling A.M. to come over – also were not assertions, and thus did not qualify as "statements" within the definition of hearsay. Moreover, none of P.B.'s messages to A.M. were offered for the truth of those responses.

{¶ 48} Even assuming, for sake of the argument, that the photographs of the

Facebook messages should have been excluded, we find that their admission did not affect Singleton's substantial rights. The photographs reiterated what A.M. had previously testified to, without objection, and the substance of those messages was before the court through several other witnesses. Officer Tyler Hofacker had testified that he responded to the hospital on a report of a sexual assault at United Thoelogical Seminary and Church. Officer Hofacker identified A.M. as the victim, and stated that A.M. had identified her assailant as the custodian/man who sat at the front desk as one enters the church. Emily Kesner, the SANE nurse, testified that, as part of her examination, she had asked A.M. what had happened. Kesner testified, without objection, that A.M. reported that she was raped and that "the alleged perpetrator had bent her over and pulled down her pants and put his thing inside of her." (Trial Tr. at 342.) DNA evidence supported A.M.'s allegations against Singleton. In light of the substantial evidence against Singleton, any error in admitting the photographs for the Facebook messages was harmless beyond a reasonable doubt.

{¶ 49} Singleton's second assignment of error is overruled.

### IV. Conclusion

{¶ 50} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

DONOVAN, P.J. and FAIN, J., concur.

Copies mailed to:

Kirsten A. Brandt
Ann M. Graber
Kate L. Bowling
Hon. Dennis J. Adkins