[Cite as *State v. Scott*, 2019-Ohio-5014.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28139 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-2634/2 |
| | : | |
| RYAN SCOTT | : | (Criminal Appeal from |
| | : | Common Pleas Court ) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of December, 2019.

. . . . . . . . . . .

MATHIAS H. HECK JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Montgomery County Prosecutor's Office, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

RICHARD HEMPFLING, Atty. Reg. No. 0029986, 15 West Fourth Street, Suite 100, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Ryan Scott appeals from his conviction and sentence for felonious assault with a repeat-violent-offender (RVO) specification.

{¶ 2} Scott advances four assignments of error. First, he contends the trial court erred in overruling his motion for a separate trial. Second, he claims the trial court erred in failing to give a complete jury instruction regarding aiding and abetting. Third, he challenges his conviction as being against the manifest weight of the evidence. Fourth, he asserts that the trial court erred in failing to note the "fact of conviction" for the repeat-violent-offender specification in its judgment entry.

{¶ 3} The record reflects that Scott and a co-defendant, Javonn Hockett, jointly were indicted and tried on multiple charges for their roles in a non-fatal shooting outside of a liquor store. In an opinion resolving Hockett's appeal,[1] we summarized the evidence and the procedural history as follows:

> On December 17, 2015, Kevin Webb was shot multiple times while in the parking lot of a liquor store known as Gina's. Webb and his sister Kaneisha McDonald had driven to Gina's to purchase alcohol. Once inside the store, Webb and McDonald encountered Hockett and Ryan Scott. Hockett made a remark to McDonald. While it is not clear what the exact remark was, the record indicates that it was suggestive or an attempt to "come on" to McDonald. The remark caused Webb to respond by saying something to the effect of "that's not going to happen." At that point, Hockett

---

[1] In *State v. Hockett*, 2d Dist. Montgomery No. 28141, 2019-Ohio-1257, we overruled Hockett's sole assignment of error, which raised a manifest-weight-of-the-evidence challenge to his felonious-assault conviction.

became angry, and he and Webb began arguing. Scott was also involved in the argument. Eventually, Webb, McDonald, Hockett and Scott left the store. Hockett and Scott entered the same vehicle, a silver Pontiac, which drove away.

A few moments later, the silver Pontiac returned to the parking lot at which time Webb was shot. Webb suffered gunshot wounds to the abdomen, right torso and right hand. Webb testified that he was first shot in the hand, and that he began to run back into the store while the shots continued. He then began to feel a burning sensation from the remaining shots to his body.

Webb was transported to the hospital, where he underwent emergency surgery requiring two trauma surgeons. During surgery, Webb lost the equivalent of four times his entire blood volume, requiring massive transfusions. Additionally, parts of Webb's liver and pancreas, as well as one entire kidney, were removed due to irreparable damage. His stomach had holes in both the front and back which required repair. The surgeons were not able to close Webb's abdomen following the initial surgery. He remained in the hospital for almost 60 days. As a result of his injuries, Webb underwent numerous additional surgeries. He also developed diabetes as a result of the pancreatic surgery, and he later began suffering seizures due to the inability to control the surgically-induced diabetes.

Following an investigation, the Dayton Police arrested Hockett and Scott. Both men were indicted on two counts of felonious assault, and each

count had attendant firearm and repeat violent offender specifications. They were also both indicted on two counts of having a weapon while under disability with attendant firearm specifications.

The felonious assault charges proceeded to a jury trial; the jury found Hockett guilty of both counts of felonious assault as well as the firearm specifications. Scott was convicted of both counts of felonious assault but not the firearm specifications. Thereafter, a bench trial was conducted on the charges of having weapons while under disability and the repeat violent offender specifications. The trial court found both men guilty of those charges and specifications.

A sentencing hearing was conducted in October 2017. At that time, the trial court noted that a written jury waiver had not been filed for either defendant relating to the counts of having weapons while under disability. Thus, the trial court dismissed those counts, along with the related firearm specifications. The trial court ordered the merger of Count 1 (felonious assault/deadly weapon) and Count 2 (felonious assault/serious physical harm), and the State elected to proceed to sentencing on Count 2. The court sentenced Hockett to an aggregate prison term of 20 years.

*State v. Hockett*, 2d Dist. Montgomery No. 28141, 2019-Ohio-1257, ¶ 3-8.

{¶ 4} For his part, Scott received an eight-year prison sentence for felonious assault and a consecutive eight-year prison sentence for the RVO specification. (Doc. # 186.) This appeal followed.

{¶ 5} In his first assignment of error, Scott challenges the trial court's denial of his

motion for a separate trial. In the February 2017 motion, Scott asserted that he and Hockett would be presenting antagonistic defenses insofar as they would be arguing at trial "that each other was the shooter." (Doc. # 41 at 4.) Scott also maintained that Hockett was "the one who got into the verbal and physical confrontation with Webb and had the reason to be upset (Webb bluntly and forcibly telling Hockett he would not allow Hockett to flirt with his sister)." (*Id.* at 5.) Scott expressed concern that the jury would infer his guilt simply by association with Hockett. (*Id.*)

{¶ 6} In an April 21, 2017 decision, the trial court overruled Scott's motion. (Doc. # 66.) It reasoned:

> Scott's defense is antagonistic in that he argues he did not shoot the gun allegedly involved in the indicted felonious assaults, but rather Hockett did. This antagonistic defense does not deny Scott a fair trial. The State intends to present the same witnesses to prove its case against Scott and Hockett. The State also has forensic evidence retrieved from the scene. Thus, Scott and Hockett do not become the government's best witnesses against each other, as Scott contends. Further, Scott's Motion only contains one sentence claiming that he and Hockett will each argue at trial that the other was the shooter. Scott has not otherwise articulated how Hockett's defense would be antagonistic to his (Scott's). For instance, it is not clear beyond Scott's unsupported assertion that Hockett will identify Scott as the shooter. * * * Without more, a limiting instruction that Scott's and Hockett's guilt or innocence must be considered separately and that evidence may be admitted against one but not the other would be sufficient to preserve

Scott's right to a fair trial.

(*Id.* at 4-5.)

{¶ 7} In *State v. Humphrey*, 2d Dist. Clark No. 2002CA30, 2003-Ohio-3401, this court recited the applicable law as follows:

Under Crim.R. 8(B), two defendants can be jointly indicted and tried for a non-capital offense as long as "they are alleged to have participated in the same act or transaction * * * or in the same course of criminal conduct." However, under Crim.R. 14, "if it appears that a defendant or the state is prejudiced by a joinder of * * * defendants * * * the court shall grant a severance of defendants, or provide such other relief as justice requires."

The law favors the joinder of co-defendants and the avoidance of multiple trials because it, "conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Daniels* (1993), 92 Ohio App.3d 473, 636 N.E.2d 336. As a result, a defendant claiming relief from joinder bears the initial burden of demonstrating that he will be materially prejudiced by the joinder. *State v. Torres* (1981), 66 Ohio St.2d 340, 421 N.E.2d 1288, 20 O.O.3d 313; *State v. Brooks* (1989), 44 Ohio St.3d 185, 542 N.E.2d 636. Absent a clear showing of abuse of discretion, a trial court's decision regarding severance will not be disturbed. *Torres* at 340, 421 N.E.2d 1288. * * *

*Id.* at ¶ 63-64.

{¶ 8} In *State v. Kleekamp*, 2d Dist. Montgomery No. 23533, 2010-Ohio-1906, this court explained "antagonistic defenses" as follows:

> "Antagonistic defenses exist when each defendant is trying to exculpate himself and inculpate his co-defendant." *State v. Humphrey*, Clark App. No. 2002-CA-30, 2003-Ohio-3401, ¶ 68. Although antagonistic defenses can be so prejudicial that they can deny a co-defendant a fair trial, antagonistic defenses are not prejudicial per se and separate trials are not required whenever co-defendants have conflicting defenses. *Id.*, citing *State v. Daniels* (1993), 92 Ohio App.3d 473, 636 N.E.2d 336, and *Zafiro v. United States* (1993), 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317. As stated in *Zafiro* in the context of Fed.R.Civ.P. 14, which is substantially similar to Crim.R. 14, "a [trial] court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. In many cases, limiting instructions are sufficient to prevent any prejudice to a co-defendant. *Id.*

*Id.* at ¶ 103.

{¶ 9} With the foregoing standards in mind, we see no abuse of discretion in the trial court's ruling on Scott's motion for a separate trial. Despite the concerns Scott expressed in his pretrial motion, he and Hockett did not present mutually antagonistic defenses at trial by each arguing that the other was the shooter.

{¶ 10} The State's most significant trial witnesses were the victim, Kevin Webb,

and his sister, Kaneisha McDonald. Webb testified that at least one of the two defendants shot him, but he did not know which one. After one of the defendants started shooting at him from inside a car, he turned and ran. Therefore, he could not say whether both defendants shot at him. (Tr. Vol. IV at 636-637, 649-650, 653, 666-667.) McDonald testified that after the silver Pontiac returned to the parking lot and stopped, both defendants exited the car and both started shooting at her and Webb. (Tr. Vol. III at 474-476, 479.)

{¶ 11} In response to the State's evidence, Hockett did not testify but called detective Thomas Cope as a witness. In his testimony, Cope discussed his investigation of the crime scene, his awareness of shell casings being found, and his viewing of the silver Pontiac allegedly involved. Cope also testified that to his knowledge no usable fingerprints were recovered from the car and that DNA test results did not impact his investigation, suggesting that such results, if any, were not useful. (Tr. Vol. IV at 785-804.) Hockett's defense at trial did not depend on incriminating Scott. Rather, Hockett's counsel argued that McDonald simply was not a credible witness and that Webb did not see who shot him.

{¶ 12} For his part, Scott presented testimony from four witnesses: (1) Steven Lehman, who claimed to have witnessed the shooting after dark from his house across the street; (2) Scott's mother, Montaga Bailey; (3) Shavia Henderson, an acquaintance of both Scott and Hockett who testified that she was present at the liquor store; and (4) Dalexus Brody, the mother of Scott's children. Lehman acknowledged that he was drunk when he saw the shooting from his porch. He admitted telling police at the time that an unidentified female had fired five or six shots before running away. (Tr. Vol. IV at 719-

720.) Bailey testified that she had taken Scott, Hockett, and an unidentified male to the liquor store in a burgundy pick-up truck. (*Id.* at 726.) According to Bailey, the three men returned to the truck after purchasing alcohol and she drove them away. While in the truck, she heard Scott cursing at Hockett about being "stupid" and "disrespectful." (*Id.* at 728-729.) About a minute after she pulled away from the liquor store, Scott and Hockett got into a "heated argument." Bailey testified that she stopped the truck, and Hockett got out with the unidentified third person. (*Id.* at 729-730.) According to Bailey, she proceeded to take Scott to Dalexus Brody's house and then drove to her own house. (*Id.* at 731-732.) In her testimony, Brody stated that Scott appeared at her door around 10:00 p.m. that night. She did not see how he got there or who brought him. (*Id.* at 760.) Finally, Henderson testified that she was in the liquor store and saw Hockett arguing with Webb. According to Henderson, Scott was trying to stop the argument. (*Id.* at 772.) Henderson testified that Scott left the liquor store before her and that when she went outside "everybody was gone." She did not hear any gunshots at all. (*Id.* at 773-774.)

{¶ 13} Hockett's counsel did not examine Steven Lehman or Dalexus Brody. (*Id.* at 720, 762.) Hockett's counsel did question Henderson but elicited nothing harmful to Scott's case. (*Id.* at 774-776.) Henderson told Hockett's counsel that she did not see anyone with a gun and did not hear any gunshots. (*Id.*) When examining Montaga Bailey, Hockett's counsel very briefly mentioned her failure to contact detectives after Scott's arrest to tell them her son had been with her. (*Id.* at 757.) We note, however, that the prosecutor already had discussed that issue with Bailey in greater detail on cross-examination. (*Id.* at 747-748, 752-754.)

{¶ 14} In short, the record persuades us that Scott and Hockett did not present

antagonistic defenses requiring separate trials. In addition, the trial court provided a limiting instruction to minimize the potential for prejudice resulting from joinder. The instruction stated: "You must separately consider the evidence applicable to each Defendant as though he or she were being separately tried and you must state your findings as to each Defendant uninfluenced by your verdict as to the other Defendant." (Tr. Vol. V at 927.) With regard to Scott's alibi, the trial court also instructed the jury that its rejection of the alibi defense would not create an inference that Scott was present at the time and place of the shooting. (*Id.* at 928.) Based on our review of the record, we conclude that the trial court did not abuse its discretion in overruling Scott's motion for a separate trial. The first assignment of error is overruled.

{¶ 15} In his second assignment of error, Scott contends the trial court erred in "failing to give a complete instruction regarding aiding and abetting." Specifically, he contends the trial court failed to include certain language found in the Ohio Jury Instructions at 2 OJI-CR 523.03(B)(9) concerning (1) the need for an aider and abettor to have "shared the criminal intent of the principle offender" and (2) the "mere presence of the defendant at the scene of the offense" not being sufficient by itself to prove aiding and abetting.

{¶ 16} The pattern OJI instruction at issue, which is drawn from *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), states:

> 9. AIDED OR ABETTED. Before you can find the defendant guilty of complicity by aiding and abetting, you must find beyond a reasonable doubt that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal offender in the commission of the offense

*and that the defendant shared the criminal intent of the principal offender.*

Such intent may be inferred from the circumstances surrounding the offense including but not limited to presence, companionship, and conduct before and after the offense was committed. *The mere presence of the defendant at the scene of the offense is not sufficient to prove, in and of itself, that the defendant was an aider and abettor.*

(Emphasis added.)

{¶ 17} Here the trial court instructed the jury as follows regarding complicity and aiding and abetting:

The law provides two ways in which criminal responsibility may be placed upon a Defendant. First, that a Defendant was the principal offender. That is the Defendant who did all the acts which make up all the elements of the particular offense charged in the indictment, which in this case is felonious assault.

Second, that the Defendant aided or abetted one or more persons in committing an offense or offenses knowing that he was facilitating the offense or offenses charged in the indictment. The second way is known as complicity.

Whether a Defendant is the principal offender or an aider and abettor, the State must prove each and every element of the charged offense beyond a reasonable doubt before the Defendant can be found guilty of the offense as either the principal offender or as the aider and abettor.

If you find that the State proved beyond a reasonable doubt that the Defendant committed all of the essential elements of the offense charged in the indictment your verdict must be guilty as to that offense or offenses. Or if you find beyond a reasonable doubt that another person or persons committed the offense or offenses charged in the indictment, then you may consider whether or not the Defendant aided and abetted such person or persons in the commission of the offense or offenses.

*An aider and abettor is a person who knowingly aids, helps, assists, encourages, or directs himself with another person or persons to commit an offense. An aider and abettor is regarded as if he were the principal offender and is just as guilty as if he personally performed every act constituting the offense.*

*The mere association, however, with one who perpetrates an unlawful act does not render a person a participant in the crime so long as his acts are innocent.*

(Emphasis added). (Tr. Vol. V at 916-917.)

{¶ 18} The trial court also specifically instructed jurors that Scott could not be found guilty of felonious assault as an aider and abettor unless they found, beyond a reasonable doubt, that he "knowingly aided and abetted another in causing or attempting to cause physical harm to Kevin Webb by means of a deadly weapon" (Count 1) or "knowingly aided and abetted another in causing serious physical harm to Kevin Webb." (Count 2). (*Id.* at 923, 925.)

{¶ 19} "When reviewing the trial court's jury instructions, the proper standard of

review is whether the trial court's decision to give or exclude a particular jury instruction was an abuse of discretion under the facts and circumstances of the case." (Citation omitted) *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 65. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 20} Here Scott objected generally to whether the evidence warranted giving an "aiding and abetting" instruction at all. (Tr. Vol. V at 817.) But he did not object to the substance of the trial court's instruction or the trial court's failure to make it more complete. (*Id.* at 829, 832.) Accordingly, he has forfeited all but plain error with respect to the language used by the trial court. In order to constitute plain error, an error must be an obvious defect in the trial proceedings, and it must have affected the defendant's substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45.

{¶ 21} Upon review, we see no error in the challenged jury instruction, plain or otherwise, and no abuse of discretion in the trial court's failure to include the language Scott addresses on appeal. Although the trial court did not use the exact language found in the pattern jury instruction, its aiding-and-abetting instructions were a correct statement of the law. They also conveyed essentially the same information that Scott claims was missing from the instructions.

{¶ 22} The trial court correctly instructed the jury regarding the culpability or mens rea required for Scott to be found guilty as an aider and abettor. It explained that he had to "knowingly" aid, help, assist, encourage, or direct himself with another person or persons to commit an offense. The trial court then again stated that Scott had to have "knowingly" aided and abetted another in committing the crimes at issue. The required mental state for a complicity instruction is that of the primary offense, and the required mental state for felonious assault is "knowingly." *See* R.C. 2903.11. Therefore, the trial court effectively communicated to the jury that Scott was required to have "shared the criminal intent of the principle offender." In *State v. Harwell*, 2d Dist. Montgomery No. 25852, 2015-Ohio-2966, ¶ 47, this court approved language similar to that employed by the trial court, noting that it adequately instructed the jury on the culpability required to be an aider and abettor.

{¶ 23} We are equally unpersuaded by Scott's argument about the lack of an instruction regarding "mere presence" being insufficient to prove aiding and abetting. The trial court instructed the jury that "mere association" with one who commits a crime is not enough to prove aiding and abetting. Being "present" with a person is simply a type of "association." Therefore, by instructing the jury that "mere association" with a principal offender was not enough, the trial court effectively did communicate the concept that "mere presence" with a principal offender was not enough. The second assignment of error is overruled.

{¶ 24} In his third assignment of error, Scott contends the jury's verdict finding him guilty of felonious assault was against the manifest weight of the evidence. His entire substantive argument is as follows:

In the present case Kaneisha [McDonald] testified that two men got out of the car and began running toward her and Kevin [Webb] and both started shooting. TR. pp. 474-476. This testimony was contradicted by Kevin himself, who never saw anyone get out of the car, and only remembered one man shooting at him by hanging out of the car window. TR, pp. 636-637. The forensic evidence gathered at the scene also supported the conclusion that there was only one gun, one shooter. *See* TR, pp. 385, 606. This coupled with the fact that Hockett was the only one with a gun inside the store, as well as Kevin's testimony that it appeared that Scott was trying to take that gun from Hockett and get him to leave the store, weighs almost inexorably toward the conclusion that Mr. Scott was not the ultimate shooter. Apparently, the jury agreed that Kaneisha's version of the shooting was not worthy of credence, inasmuch as it found Hockett guilty on his firearm specifications, and acquitted Mr. Scott with regard to his.

In light of the foregoing, then it is incumbent upon the Court to determine whether convicting Mr. Scott under a theory of complicity was also against the manifest weight of the evidence.

As has been noted previously, with regard to the first incident in the store before someone initially drove Mr. Scott and Mr. Hockett from the scene, it is apparent that Mr. Scott's words and actions weighed heavily toward the conclusion that he was attempting to de-escalate the situation. And, with regard to the actual shooting event, even if the jury didn't believe

Mr. Scott's alibi evidence, there remains the undeniable fact that there was absolutely no evidence presented that Mr. Scott, if present in the car, ever spoke or encouraged Hockett in any way to shoot at Kevin. Nor was there any evidence that Mr. Scott was driving the vehicle back to the site of the shooting or was in any other way assisting Hockett. Thus, his conviction under a theory of complicity was against the manifest weight of the evidence and must be reversed.

(Appellant's brief at 11.)

{¶ 25} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 26} With the foregoing standards in mind, we conclude that Scott's felonious assault conviction was not against the weight of the evidence. We are unpersuaded by his argument that "conflicting" testimony and forensic evidence necessarily supported a conclusion that there was only one shooter. Although Webb saw only one shooter and McDonald saw two, we reconciled this alleged conflict in our disposition of Hockett's appeal, reasoning:

* * * [W]e cannot say that the testimony regarding the shooters is contradictory. Webb testified that the Pontiac returned to the parking lot at which time Webb observed it stop with a person hanging out of the window shooting at him; he was, however, unable to identify the shooter. Webb testified that he was shot in the hand, at which point he began running back into Gina's. McDonald testified that she saw both Hockett and Scott exit the vehicle and shoot at Webb. Based upon this testimony, it is entirely possible the jury determined that McDonald and Webb observed the shooters at different points in time. In other words, Webb initially saw the car, with a shooter hanging out the window, return to the parking lot and stop. Then he was shot in the hand at which point he turned to run into the store and did not observe, as McDonald did, the two men exit the vehicle. Therefore, we find this argument lacks merit.

*Hockett* at ¶ 17.

{¶ 27} The forensic evidence also does not require a finding of only one shooter. Although the nine-millimeter shell casings found at the scene all came from the same semi-automatic handgun, the State presented testimony establishing that revolvers do not eject shell casings. (Tr. Vol. II at 338; Tr. Vol. IV at 606-610.) Therefore, the forensic evidence and the testimony of Webb and McDonald would support a finding that Hockett and Scott both fired weapons, one of which was a semi-automatic and one of which was a revolver. The fact that Scott did not display a firearm inside the liquor store also did not render his conviction against the manifest weight of the evidence. In light of McDonald's testimony that she saw Hockett and Scott both firing shots, Webb simply may have left

his weapon in the silver Pontiac when he went inside the store. And the fact that Scott tried to disarm Hockett inside the store did not establish that he was acting as a peacekeeper. McDonald testified that her perception was Scott was trying to take the weapon away from Hockett to use or threaten to use it himself, not to defuse the situation. (Tr. Vol. III at 520-521.) Similarly, Webb testified that Hockett and Scott both were arguing with him inside the liquor store. (Tr. Vol. IV at 628.) With regard to Scott trying to take Hockett's weapon, Webb explained:

Basically he [Scott] was pushing him [Hockett] out like bro, we got him. Like he was trying to grab him [sic] gun at the same time. That's why I said I didn't know if he was trying to grab the gun to keep from shooting me in the store or was trying to grab it to retaliate it with me, but he was basically pushing him out of the store like bro it's cool. We got him. We going to get him. That's he was pushing him out of the store. * * *

That's basically how he [Scott] was doing. I don't know what he was saying.

(*Id.* at 652.)

{¶ 28} Based on the record before us, the manifest weight of the evidence supported a finding that Hockett and Scott both fired handguns toward Webb and McDonald. Although the State failed to establish whether Hockett or Scott, or both, fired the shots that actually hit Webb, such evidence was not necessary. The jury found Scott guilty of felonious assault under R.C. 2903.11(A)(1) and (A)(2), which provide that no person shall knowingly "[c]ause serious physical harm to another" or knowingly "[c]ause or attempt to cause physical harm" with a deadly weapon. Even if Hockett fired all of the

shots that struck Webb, the weight of the evidence supported a finding that Scott aided and abetted Hockett in knowingly causing serious harm by also firing at Webb. And by firing at Webb, Scott also knowingly attempted to cause serious physical harm with a deadly weapon even if his shots missed.

{¶ 29} In opposition to the foregoing analysis, Scott contends the jury necessarily found, as a factual matter, that he was not a shooter on the night in question. He reaches this conclusion based on the jury acquitting him of the firearm specifications accompanying the felonious assault charges. Based on the premise that he did not shoot a gun at Webb, Scott then argues that the remaining evidence failed to support his conviction under a theory of complicity.

{¶ 30} We find Scott's argument to be unpersuasive. As set forth above, the manifest weight of the evidence reasonably supported a finding that Scott shot at Webb. And we have no way of determining with confidence whether the jury believed Scott was an actual shooter or whether it found that he acted as an accomplice in other ways. The jury simply returned general verdicts finding Scott guilty on two counts of felonious assault. We are not required to infer from his acquittal on the firearm specifications that he necessarily did not fire a weapon. An acquittal on a firearm specification will not undermine a guilty verdict on a principal charge where a guilty verdict on the principal charge is supported by the evidence. *State v. Davis*, 9th Dist. Summit No. 26660, 2013-Ohio-5226, ¶ 35; *State v. Smith*, 2d Dist. Montgomery No. 26116, 2015-Ohio-1328, ¶ 17. That is the case here. In our view, it is inappropriate to speculate about or infer any factual finding based on the jury's failure to convict Scott of the firearm specifications while finding him guilty of both counts of felonious assault. There is simply no way of knowing why the

jury failed to find Scott guilty of the specifications, and its verdict may have been the product of leniency or compromise. The bottom line is that the manifest weight of the evidence supported Scott's conviction on both counts of felonious assault for participating in the shooting of Webb with co-defendant Hockett. That being so, we overrule the third assignment of error.

{¶ 31} In his fourth assignment of error, Scott claims the trial court erred in failing to note the "fact of conviction" for the repeat-violent-offender specification in its judgment entry, which the trial court calls a "termination entry." Scott contends the trial court's termination entry imposed an eight-year sentence on the specification while being "completely devoid of any finding or reference to the fact that Appellant was convicted of that specification." (Appellant's brief at 12.)

{¶ 32} In a June 26, 2019 decision and entry, we determined that the alleged defect about which Scott complains did not negate the existence of a final, appealable order. We reasoned:

"A judgment of conviction is a final order subject to appeal under R.C. 2505.02 when the judgment entry sets forth (1) the fact of conviction, (2) the sentence, (3) the judge's signature, and (4) the time stamp indicating the entry upon the journal by the clerk." *State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, ¶ 14. Appellant questions whether the order on appeal—the October 24, 2017 "Termination Entry"—is final, in that it does not specifically contain the "fact of conviction" of the Repeat Violent Offender specification attached to count 2 of the indictment. As appellant notes, some courts have held that the four requirements for a final

appealable order in a criminal case also apply to specifications. * * *

However, in 2012, the Supreme Court of Ohio rejected the argument that an otherwise complete sentencing entry was not final because it failed to dispose of a firearm specification. *State ex rel. Jones v. Ansted*, 131 Ohio St.3d 125, 2012-Ohio-109, 961 N.E.2d 192, ¶ 2. The Court referred to its decision in *State v. Ford*, parenthetically noting that a " 'firearm specification is merely a sentence enhancement, not a separate criminal offense.' " *Ansted* at ¶ 2, quoting *Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, ¶ 17.

"Since *Ansted*, other appellate districts have determined that a trial court's failure to address sentencing-enhancing specifications does not render the entry a non-final, non-appealable order." *State v. Blackburn*, 4th Dist. Jackson No. 18CA3, 2019-Ohio-420, ¶ 4 (citing cases from the Fifth and Eighth Districts). Instead, any such failure is a sentencing error that can be addressed on appeal." *State v. Clark*, 8th Dist. Cuyahoga No. 101449, 2014-Ohio-5693, ¶ 11-12.

{¶ 33} Here the trial court's October 24, 2017 termination entry did mention the repeat-violent offender specification, but it did so inaccurately and incompletely. The first paragraph of the entry stated:

Defendant herein having entered a Jury Trial to the Offenses of COUNT 1: FELONIOUS ASSAULT (deadly weapon) – 2903.11(A)(1)(F2) with a REPEAT VIOLENT OFFENDER SPECIFICATION—2929.14(B)(2)(a) and 2941.149 and COUNT 2: FELONIOUS ASSAULT (serious physical harm)

– 2903.11(A)(2)(F2) with a REPEAT VIOLENT OFFENDER SPECIFICATION—2929.14(B)(2)(a) and 2941.149 was on October 20, 2017, brought before the Court.

(Doc. # 186 at 1.)

**{¶ 34}** The termination entry then turns to sentencing. The only mention of the repeat-violent-offender specification is as follows:

COUNT 2: EIGHT (8) YEARS TO RUN CONSECUTIVELY TO THE REPEAT VIOLENT OFFENDER SPECIFICATION.

REPEAT VIOLENT OFFENDER SPECIFICATION: EIGHT (8) MANDATORY YEARS ACTUAL INCARCERATION to be served CONSECUTIVELY to Count 2 for an aggregate prison sentence of SIXTEEN (16) MANDATORY YEARS.

(*Id.*)

**{¶ 35}** The first paragraph above is inaccurate, or at least inartfully drafted, insofar as it suggests that Scott was tried by a jury on the felonious assault charges and the repeat-violent-offender specifications. To the contrary, those specifications were tried to the bench. The first paragraph also is incomplete as it fails to record the outcome after Scott "entered a jury trial." It simply indicates that Scott faced felonious assault charges with repeat-violent-offender specifications. It does not indicate that the jury or the trial court found the specifications proven.[2] That fact is established elsewhere in the record

---

[2] With respect to Count 2, the felonious assault charge on which the trial court proceeded to sentencing, we note that the heading of the termination entry contained the following additional information: "Convicted Of: Count 2: Felonious Assault (serious physical harm)(F2) by Defendant herein having been found guilty by a jury." (Doc. # 186 at 1.)

where the trial court entered its own verdict against Scott on the specifications. (Doc. # 181.) That the specifications were proven also is implicit in the termination entry insofar as the trial court proceeded to sentence Scott as a repeat violent offender. Nevertheless, the termination entry itself does not clearly state that the trial court found Scott to be a repeat violent offender. As set forth above, that omission is not a jurisdictional defect, and the trial court did impose sentence on the specification. Because the record reflects that the trial court found Scott guilty of the specification and sentenced him on it, we agree with the State that the noted deficiencies in the termination entry regarding the repeat-violent offender specifications can be cured by the trial court through a nunc pro tunc entry. *State v. McIntyre*, 2d Dist. Montgomery No. 25502, 2013-Ohio-3281, ¶ 5, quoting *State v. Miller*, 127 Ohio St.3d 407, 2010-Ohio-5705, 940 N.E.2d 924, ¶ 15 ("[A] nunc pro tunc entry may be used to 'reflect what the trial court did decide but recorded improperly.' "). Accordingly, Scott's fourth assignment of error is sustained.

{¶ 36} Based on the reasoning set forth above, we affirm the trial court's judgment but remand the matter for the trial court to issue a corrective nunc pro tunc judgment entry.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck Jr.
Michael P. Allen
Richard Hempfling
Hon. Michael W. Krumholtz