[Cite as *State v. Green*, 2020-Ohio-5206.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28614 |
| | : | |
| | : | Trial Court Case No. 2018-CR-4618 |
| v. | : | |
| | : | (Criminal Appeal from |
| TAJRAE MARQUIS GREEN | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of November, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Tajrae Marquis Green was convicted after a jury trial of aggravated burglary, a first-degree felony. The trial court sentenced him to 10 years in prison and ordered him to pay restitution of $50 and court costs.

{¶ 2} Green appeals from his conviction, claiming that (1) the trial court erred in denying his motion to suppress an eyewitness identification, (2) his conviction was based on insufficient evidence and was against the manifest weight of the evidence, (3) the court erred in allowing other acts evidence, (4) the court erred in failing to give a jury instruction on alibi, (5) cumulative error deprived him of a fair trial, and (6) the court failed to consider appropriate statutory factors at sentencing. For the following reasons, the trial court's judgment will be affirmed.

## I. Motion to Suppress

{¶ 3} In his first assignment of error, Green claims that the trial court erred in failing to suppress the victim's pretrial identification of him.

{¶ 4} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id*.

{¶ 5} Detective Jeffrey Colvin of the Huber Heights Police Department was the sole witness at the suppression hearing.   His testimony established the following facts.

{¶ 6} On November 17, 2018, Judy Owens was alone in her home when she heard her doorbell ring.   Owens went to the door, but she did not recognize the individual and did not open the door.   She then went to a bedroom window, watched the man go to and get into a silver car, and saw him "kind of wrestle around" in the car.   Owens went back to her living room, where she was watching the Ohio State football game, and the doorbell rang again.   Owens was a little slower getting up this time, and when she walked back to the hallway to go to the bedroom, the man was standing in the hallway inside her house. Owens asked him how he got in the house.   The man raised his fist up and asked where her purse was.   Owens walked to the kitchen and got money out of her purse, handed it to him, and he told her to go to the back bedroom and to wait ten minutes before coming out.   The man left the house after receiving the money.   The silver car was gone when Owens went back to the window to look.   Owens immediately called the police.

{¶ 7} At approximately 12:37 p.m., police officers were dispatched to Owens's home on a report of an aggravated burglary.   Owens relayed to the officers what had occurred, and she provided a physical description of the perpetrator to the responding officers.

{¶ 8} Detective Colvin followed up with Owens by telephone on November 19. During their conversation, Owens described the perpetrator.   Colvin recalled the description as "black male, 20-ish" years old, "six-foot, 170 [pounds, and] short dreadlocks."   Owens did not describe the perpetrator's clothing, but she indicated that he was neatly dressed.   The description was similar to the one provided to the

responding officers.   Owens did not know the burglar and had never seen him before. Owens also told Colvin that the burglar had a four-door silver sedan.   Colvin did not have a suspect at that time.

{¶ 9} After the burglary of Owens's home, a few more daytime burglaries occurred where the perpetrator was described similarly to the man Owens had described and was driving a silver or gray Honda.   On November 29, the Huber Heights Police Department received information from the Montgomery County Sheriff's Office about a similarly-described individual who had acted suspiciously around a home in Harrison Township on November 26.   The resident inside the home had taken a photo of the individual and the individual's Honda.   The Sheriff's Office forwarded the two photos to the Huber Heights Police Department.   Detective Colvin spent several days looking at records for early 2000s silver Hondas.

{¶ 10} On December 3 (16 days after the burglary of Owens's home), Detective Colvin went to Owens's residence to get a DNA standard from her to exclude her DNA from any evidence the police had obtained.   While there, Colvin showed Owens the photographs he received from the Montgomery County Sheriff's Office of the Honda and of the individual.   Colvin showed Owens the photo of the car first, and Owens responded that the photo showed the vehicle that had been outside her home.   (Colvin acknowledged that the vehicle in the photo was a four-door, but Owens testified at the preliminary hearing in this case that the vehicle she saw was a two-door.)   When Colvin showed Owens the photo of the man, Owens "became emotional."   Colvin testified: "I think she teared up a little bit, and she [said], I'm 100 percent sure that's the one that was in my house."

{¶ 11} Detective Colvin testified that he did not have a name, birthdate, Social Security number, or any other information about the man in the photo. He stated that, if he had, he would have prepared a photo spread for Owens.

{¶ 12} The same day as Owens's identification, the police department posted the photos on social media seeking assistance from the public. Several people responded to the department that they had had similar experiences. In addition, on December 4, Detective Minnix from the Vandalia Police Department called to say that Green might the person that the Huber Heights Police Department was looking for. Vandalia was also experiencing daytime burglaries, and Minnix had identified Green as the person who had sold a particular stolen necklace.

{¶ 13} Detective Minnix was conducting surveillance of Green's apartment. Detective Colvin met Minnix there, and they obtained a search warrant for Green's apartment and vehicle.

{¶ 14} Green moved to suppress Owens's identification, which purported to identify him as the perpetrator of the aggravated burglary. Green claimed that Detective Colvin's single-photo identification process was improperly suggestive and created a "substantial risk of irreparable mistaken identification."

{¶ 15} After a hearing, the trial court overruled the motion. The trial court initially found that the presentation of the photographs was inherently, and thus unnecessarily, suggestive. The court nevertheless concluded that Owens's identification was reliable. The court reasoned, in part:

> * * * Ms. Owens was able to closely view Green twice on the day of the
> alleged aggravated burglary: once when he initially rang the doorbell and

then left, and then once when he actually entered Ms. Owens' house. Green was in Ms. Owens' hallway, pointing a gun at her. Ms. Owens retrieved her purse and money and gave the money to Green. She also observed him get into a silver car twice. Ms. Owens provided a description of the suspect to responding officers on the day of the offense, and then provided the same description to Det. Colvin two days later. She described the suspect as a black male in his twenties, who appeared to be about one hundred seventy pounds and who had short dreadlocks. The photograph of Green which Det. Colvin showed Ms. Owens was taken twelve days after the alleged aggravated burglary offense, and showed a black male with short dreadlocks. State's Ex. 1. Ms. Owens was shown this photograph on December 3, 2018, sixteen days after the offense was allegedly committed. When Ms. Owens' observed State's Ex. 1, she identified the individual as the person who had been in her house with 100% certainty. Thus, based on the totality of the circumstances, the Court finds that Ms. Owens' pretrial identification was reliable. As such, Green's constitutional rights were not violated by this identification.

{¶ 16} Green subsequently filed a motion for reconsideration, arguing that several of the court's factual findings were not supported by the suppression hearing testimony: (1) that Owens answered the door when the burglar first rang the doorbell, (2) that the burglar had a gun, and (3) that DNA from Green matched DNA obtained from Ms. Owens' house.

{¶ 17} The trial court overruled the motion to reconsider. It explained:

While the Court may have mistakenly understood Det. Colvin to testify that Green was in Ms. Owens' house with a gun in his hand, the fact that Green had a gun was not determinative in finding Ms. Owens' pre-trial identification to be reliable. Rather, the Court highlighted that Ms. Owens observed Green at her front door when he "initially rang the doorbell and then left" and then standing in front of her in the hallway of her house. Motion to Suppress Decision, p. 4. These two observations allowed Ms. Owens to consistently describe the suspect to both the responding officers and Det. Colvin as a black male in his twenties who appeared to be approximately one hundred seventy pounds and who had short dreadlocks. *Id.* The consistency of the descriptions, which provided specific details, lends to the reliability of Ms. Owens' pre-trial identification. In its Decision, the Court indicated that Ms. Owens "answered her front door." *Id.* at p. 1. This was not intended to imply that Ms. Owens opened the front door, but rather that she responded to the doorbell by going to the front door in order to observe the person who rang the bell. Further, at no point in its analysis did the Court refer to any discovery of Green's DNA as a factor related to the reliability of Ms. Owens' identification. *Id.* at p. 4-5. Rather, the Court emphasized that within sixteen days of the alleged commission of the offense, Ms. Owens identified with 100% certainty that the individual in the photograph Det. Colvin showed her was the person who had been in her house. *Id.* at p. 5. The Court also noted that the individual in this photograph was a black male with short dreadlocks. *Id.*

{¶ 18} On appeal, Green claims that the trial court erred in failing to suppress Owens's identification for two reasons. First, he argues that the identification procedures employed by Detective Colvin did not comply with R.C. 2933.83. Second, he asserts that the record does not support the trial court's conclusion that Owens's identification was reliable.

{¶ 19} "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶ 20} The defendant must first show that the identification procedure was unduly suggestive. We have recognized that a show-up identification procedure, which involves showing just one individual to an eyewitness, as opposed to a lineup of different individuals, is inherently suggestive. *E.g.*, *State v. Henderson*, 2d Dist. Montgomery No. 28241, 2020-Ohio-6, ¶ 20; *State v. Martin*, 127 Ohio App.3d 272, 277, 712 N.E.2d 795 (2d Dist.1998). "Nevertheless, an individual show-up identification procedure may survive constitutional challenge if there is evidence that it is sufficiently reliable." *Martin* at 277.

{¶ 21} When a defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive procedure. *See Williams* at ¶ 13. In reviewing the likelihood that the circumstances resulted in a misidentification, courts have considered the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of

the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[1]  *Biggers* at 199-200; *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208, ¶ 8.   Nevertheless, "[a]gainst these factors is to be weighed the corrupting effect of the suggestive identification itself."  *Manson.* at 114. *See, also, State v. Main*, 2d Dist. Montgomery No. 26952, 2016-Ohio-4892, ¶ 7.

{¶ 22} Reliability of the pretrial identification is the linchpin in determining its admissibility. *Manson* at 114.   "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002).

{¶ 23} We review a trial court's denial of a motion to suppress a pretrial identification for an abuse of discretion. *State v. Wilson*, 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 19; *State v. Dewberry*, 2d Dist. Montgomery No. 27434, 2020-Ohio-691, ¶ 75.

{¶ 24} Green argues that Detective Colvin failed to comply with R.C. 2933.83.

---

[1] We have previously noted that some of the factors identified in *Biggers* may bear reconsideration in light of the significant advancement of scientific understanding of memory. *See State v. Frazier*, 2016-Ohio-727, 60 N.E.3d 633, ¶ 18, fn. 1 (2d Dist.); *State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 12, fn. 3.   For example, *Biggers* and *Manson* direct courts to consider the witness's degree of certainty in the identification, yet studies have repeatedly shown little relationship between certainty and accuracy. *See, e.g., State v. Mabberly*, 2d Dist. Montgomery No. 27729, 2019-Ohio-891, ¶ 41, ¶ 44.   Nonetheless, as an intermediate court of appeals, this court must continue to follow the factors articulated in *Biggers* and *Manson*, as required by Ohio Supreme Court precedent. *See, e.g., State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208, ¶ 9; *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 19, ¶ 25.

That statute, which was enacted in 2010, provides minimum requirements for live lineup and photo lineup procedures. However, a failure to comply with R.C. 2933.83 does not necessarily require suppression. R.C. 2933.83(C)(1) states that evidence of the failure to comply with the required procedures "*shall be considered* by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." (Emphasis added.) *See also, e.g., State v. McShann*, 2d Dist. Montgomery No. 27803, 2019-Ohio-4481, ¶ 40 ("even if a violation of R.C. 2933.83 occurs, violations of that statute are not independent grounds for suppression."); *State v. Harmon*, 2017-Ohio-8106, 98 N.E.3d 1238, ¶ 23 (2d Dist.). Accordingly, we focus on whether "the procedure used in administering the photospread in this case, while not in compliance with R.C. 2933.83, was 'not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.' " *Harmon* at ¶ 31, quoting *State v. Moon*, 2d Dist. Montgomery No. 25061, 2013-Ohio-395, ¶ 35.

{¶ 25} In this case, the trial court found, and we agree, that the show-up identification procedure was unduly suggestive. Thus, the question before us is whether Owens's identification nevertheless was reliable. Although we find this to be a close call, we cannot conclude that the trial court abused its discretion when it determined that Owens's identification was reliable.

{¶ 26} As an initial matter, Green argues that the record was insufficient to demonstrate the reliability of Owens's identification because Owens did not testify at the suppression hearing. We disagree. Detective Colvin's testimony provided ample detail about Owens's encounter with Green for the trial court to make a determination about the reliability of Owens's identification. While the trial court would have been aided by

additional testimony from Owens, we do not conclude that Detective Colvin's testimony, alone, was insufficient.

{¶ 27} We note that there is no suggestion in the record that defense counsel attempted or asked to call Owens and was denied the opportunity to do so. *Contrast State v. Dewberry*, 2d Dist. Montgomery No. 27434, 2020-Ohio-691, ¶ 82 (the trial court erred in precluding defendant from calling the victim as a witness at the suppression hearing on victim's photospread identification of defendant). Owens testified at trial, but when reviewing suppression rulings, we consider only the evidence before the trial court at the suppression hearing; we cannot consider any evidence outside the record of the suppression hearing. *State v. Curley*, 2016-Ohio-7624, 73 N.E.3d 1050, ¶ 19 (2d Dist.), citing *State v. Harris*, 2d Dist. Montgomery No. 26810, 2016-Ohio-7097, ¶ 3.

{¶ 28} Detective Colvin's evidence at the suppression hearing established that a young man came to Owens's residence during the noon hour on a Saturday. Owens was alone in her home. Upon hearing the doorbell ring, Owens went to the door and looked at the individual at her door, but did not recognize him and did not answer the door. She then went to a bedroom window and observed him as he went to his car, got into it, and "kind of wrestle[d] around" in the car. During this time, Owens was not under the stress of an ongoing criminal offense. After getting up in response to a second ringing of her doorbell, Owens encountered the man inside her house. She walked to her kitchen with him, got money out of her purse, and handed it to him.

{¶ 29} Colvin's testimony demonstrated that Owens had an opportunity to witness the perpetrator prior to and during the offense; she was in close proximity to him when she viewed him at her door and while in her house. Owens paid more than glancing

attention to him, considering that she watched him go to the car and "wrestle around" inside it. Owens gave a detailed description – "black male, 20-ish" years old, "six-foot, 170 [pounds,] short dreadlocks," and neatly dressed. She provided similar descriptions to the responding patrol officers and, two days later, to Detective Colvin. Owens was confident in her identification, although that factor perhaps should be given less weight. All of these factors support a conclusion that Owens's identification of Green was reliable despite the suggestiveness of the single photograph.

{¶ 30} Owens did not know Green and had not seen him before. In addition, 16 days elapsed between the burglary and the show-up identification. While these factors may weigh against the reliability of Owens's identification, they did not require a conclusion that the identification was unreliable. *See State v. Montgomery*, 2d Dist. Montgomery No. 25277, 2013-Ohio-4509, ¶ 35 (photospread identification after 11-day delay was reliable); *State v. Davis*, 8th Dist. Cuyahoga No. 101502, 2015-Ohio-1144, ¶ 25 (show-up identification approximately one month after robbery was reliable); *State v. Henderson*, 2d Dist. Montgomery No. 9229, 1986 WL 2361, *2 (Feb. 21, 1986) (victim's identification of defendant at a preliminary hearing almost three months after the offense was reliable). Under the totality of the circumstances, the trial court did not abuse its discretion in denying Green's motion to suppress Owens's pretrial identification.

{¶ 31} The first assignment of error is overruled.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 32} In his second assignment of error, Green claims that his conviction for aggravated burglary was based on insufficient evidence and against the manifest weight of the evidence. Specifically, he argues that the evidence did not support the

conclusions that he was the perpetrator and/or that the perpetrator "inflicted, or attempted to inflict, physical harm on Owens."

**{¶ 33}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

**{¶ 34}** In contrast, when reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact, but reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 35}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different

interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 36} The State presented five witnesses and several exhibits at trial; Green did not present any evidence.

{¶ 37} Owens was 72 years old when the trial occurred. She testified that, shortly after noon on Saturday, November 17, 2018, she was alone at her three-bedroom, ranch-style home in Huber Heights. The house was situated along the circle of a cul-de-sac in a residential area.

{¶ 38} Owens testified that she was a fan of The Ohio State University football team, and she was watching them play Maryland; she recalled that Ohio State was playing poorly and she had muted the television. During the game, Owens's doorbell rang. Owens got up to see who was at the door. She stated that she had a long foyer and an opaque door, so she could see out, but people could not see in. From the end of her foyer, Owens saw that a young man was standing at the door; she stood there watching him for several seconds. Owens described him as nice-looking with short dreadlocks and a goatee. Owens assumed that he was trying to sell something, and she decided not to answer the door.

{¶ 39} Owens returned to her living room to continue watching the football game. After she had been seated for a few seconds, her doorbell rang four or five times in rapid succession. Owens was not interested in answering the door, but she went to her computer room (a bedroom in the front of her home) that looked out toward the street. Owens saw the young man run back to his car, which was parked across the street, get

inside, and start "throwing clothes around." Owens testified that her view was not obstructed by trees or bushes. Owens thought he was getting ready to leave, so she went back to sit on her living room couch.

{¶ 40} After Owens sat down, her doorbell rang again. Owens went back to the bedroom/computer room to look out. The man's vehicle was still there, but she did not see him. Owens thought he might have gone to a neighbor's home. Owens headed back to her living room.

{¶ 41} Upon leaving her computer room, she found the young man, later identified as Green, standing right in front of her, about a foot away. Owens asked him, "How the hell did you get into my house?" Green did not answer her, but "held up his fist in [Owens's] face and asked [her] if [she] had any money." Owens testified that she interpreted Green's raised fist as a legitimate threat, and she said she did. Green asked where the money was, and Owens told him it was in her purse, which was in the kitchen. Green told her to get it, and he followed Owens to her kitchen. Owens asked Green not to hurt her. With Green watching, Owens retrieved between $40 and $50 from her wallet.

{¶ 42} Owens testified that she did not know Green prior to the burglary, she did not give him permission to be in her home, she did not give him permission to take money from her wallet, and she gave him the money because she was afraid. Owens stated that she was afraid because he had threatened her with his fist.

{¶ 43} After getting the money, Green told Owens to go into her back bedroom. Green followed Owens to the bedroom, again raising his fist. Owens repeatedly asked Green not to hurt her. Green opened the bedroom door, Owens went in, and Green pulled the door closed. Green told her not to come out for ten minutes. Owens

immediately locked the door. When she heard her front door close, she ran to her phone, and when she was calm enough to do so, she called 911.

{¶ 44} At 12:38 p.m., officers were dispatched to Owens's home. Officer Aaron Harlow, the first to respond, arrived a couple minutes later. Upon arrival, Harlow walked around the exterior of Owens's home to ensure that the perpetrator or an accomplice was no longer there; Harlow did not find anyone. He noticed, however, that a window along the north side of the home was open and that the blinds were "out of whack."

{¶ 45} Officer Stose also responded to Owens's home, arriving shortly after Officer Harlow. Stose made contact with Owens, who was crying, shaking, and "hysterical." The two officers went into Owens's home and obtained a description of the perpetrator and his vehicle. Officer Harlow testified that Owens described the perpetrator as male, younger, about six feet tall, having three-inch-long dreadlocks, and good-looking. Harlow stated that Owens could not describe the perpetrator's clothing, other than the fact that he was wearing a long-sleeved shirt. Owens told the officers that the man made no attempt to wear a mask or cover his face or wear gloves. Owens described the vehicle as "either a gray or light bluish, gray-colored four-door sedan."

{¶ 46} Officer Harlow requested that an evidence technician come to the residence. Officer Hartman responded.[2] After taking photographs of the scene, he attempted to lift fingerprints from around the bedroom window identified as the point of entry; Hartman could not locate any usable latent prints. Officer Hartman swabbed for DNA from the doorknob to the bedroom where Green told Owens to wait. Hartman did not attempt to collect a fingerprint or DNA from the doorbell.

---

[2] Hartman retired from the Huber Heights Police Department prior to trial.

{¶ 47} Detective Colvin was assigned to Owens's case, and he called her on Monday, November 19, 2018, to follow up. Owens described the events and the perpetrator consistently with her prior report.

{¶ 48} Detective Colvin testified that he did not have any suspects at that time. He indicated two daytime burglaries previously had occurred in Huber Heights, and Colvin reached out to other police agencies to see if they had similar crimes being committed. On November 29, Detective Statzer of the Montgomery County Sheriff's Office, who worked in Harrison Township, provided Colvin's sergeant with two photographs: one of a person who matched Owens's description of the perpetrator and the other of a silver Honda Accord. The sergeant forwarded the photos to Colvin. Colvin still did not know the identity of the individual shown. Colvin spent a couple of days looking through Honda Accord vehicle records trying to match the vehicle with a registered owner who looked like the photo. He was unsuccessful.

{¶ 49} Colvin testified that he needed to get a DNA sample from Owens so that he could submit the DNA from the doorknob to the Bureau of Criminal Investigation crime lab. He went to Owens's residence on December 3 to do so. Colvin also took with him copies of the two photographs that he had received; he wanted some confirmation that the individual was involved before having the photo posted on the department's Facebook page to see if anyone could identify him.

{¶ 50} After collecting a DNA sample from Owens, Detective Colvin presented her with photocopies of two photographs. Colvin testified that he did not tell Owens about the suspect or how the photos had been obtained. Colvin showed Owens the photo of the car first and then the photo of the individual. He stated that she identified them both

as being the perpetrator and his vehicle. Colvin stated that Owens became emotional when she saw Green's photo.

{¶ 51} Owens testified that Colvin "came to my home, and he said he had a couple pictures he wanted to show me to see if I recognized the individual that robbed me. And as soon as I saw him, I recognized both the Defendant and the car." Owens denied that the detective asked her to confirm that the photograph showed the perpetrator. However, Owens stated on cross-examination that she assumed that he was going to show her photos of the person "who robbed me." Owens signed and dated the print-outs.

{¶ 52} When shown copies of the photographs at trial, Owens stated, "This is the guy that robbed me and that's his car." Owens also identified Green at trial, noting that he had gotten a haircut; she said she was 100 percent certain that he was the individual who was in her home on November 17, 2018. On cross-examination, Owens acknowledged that she may have previously testified at the preliminary hearing that the car was a two-door vehicle; the photo showed a four door vehicle. Owens stated that she was focusing on the person more than the car.

{¶ 53} The photograph of Green was placed on the Huber Heights Police Department Facebook page. On December 4, Detective Minnix of the Vandalia Police Department contacted Colvin and provided Colvin with Green's name. Colvin then learned Green's address, and he went to that location with several other officers. The silver Honda Accord was parked behind the apartment building.

{¶ 54} Detective Colvin obtained a search warrant for the Honda Accord, and he learned that the vehicle was owned by Dounisha Barwick-Jones. Barwick-Jones testified

that she had known Green since she was 12 years old, and she identified him as the defendant at trial. She testified that, in November 2018, she owned a 2001 silver Honda Accord, which she allowed Green to drive regularly; a different vehicle was her primary vehicle. Barwick-Jones stated that the Honda had some damage.

{¶ 55} On December 5 or 6, Detective Colvin contacted Barwick-Jones and met her at her house. Barwick-Jones testified that Colvin explained that he had seen her car at a location and he wanted her to indicate if it was hers. Detective Colvin showed Barwick-Jones copies of the same photos that he had shown Owens. Barwick-Jones testified that one photo was of Green and that other "looked like" her Honda Accord; Barwick-Jones acknowledged that she told Colvin that the photo was of her car.

{¶ 56} On cross-examination, Barwick-Jones testified that Green had spent the night (November 16 to 17) with her and stayed with her until he drove her to work on November 17. Barwick-Jones stated that she went to work around 1:00 or 2:00 p.m. Barwick-Jones testified that she and Green did not go to Owens's address and that the Honda was with her (Barwick-Jones) between 12:30 and 1:00 p.m. on November 17.

{¶ 57} On redirect examination, Barwick-Jones stated that she did not "remember days," and she could not say what happened on November 16, 18, 19, or 20. Barwick-Jones said that she "had a whole bunch of things going on personally with my life." She said that she remembered November 17, because Green mostly stayed over at her house (either there or at his older brother's house). When asked about her work schedule, Barwick-Jones stated that she worked almost every day.

{¶ 58} Detective Colvin testified that Barwick-Jones never told him that she was with Green on November 17.

{¶ 59} Owens testified that she reported to Detective Colvin that after the incident with Green, another person, purportedly from Panera Bread, had come to her home unexpectedly. Colvin testified that he followed up on Owens's report; he learned from a Panera Bread manager that the restaurant had an address listed incorrectly and the order was for a neighbor. The detective stated that the incident with the Panera driver was unrelated to the burglary.

{¶ 60} The jury found Green guilty of aggravated burglary, in violation of R.C. 2911.11(A)(1), a first-degree felony. That statute provides:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another[.]

{¶ 61} Green does not dispute that the perpetrator, by force, trespassed in Owens's occupied residence while Owens was present. We agree that the evidence supports such a conclusion. Green argues that he was not perpetrator and that he did not inflict or attempt to inflict physical harm.

{¶ 62} Green is correct that the State did not present evidence that he harmed or attempted to harm Owens. However, R.C. 2911.11(A)(1) also may be violated by threats of physical harm. In this case, Green raised his fist when he asked Owens if she had

money, and he again raised his fist in the kitchen when he told her to go into the bedroom. Owens testified that she interpreted Green's raised fist as a "legitimate threat," that she was afraid, and that she repeatedly asked him not to hurt her. Owens's testimony supported a reasonable conclusion that Green threatened Owens with physical harm.

{¶ 63} As for the identity of the perpetrator, Owens identified Green as the burglar, both prior to and at trial. Owens and Detective Colvin both testified that Colvin had gone to Owens's home on December 3, 2018, at which time Colvin showed Owens photographs of an individual and a Honda Accord; the detective noted at trial that the photograph of the man "matched the description of our suspect down to the height, weight, the body type, the length of the dreadlocks, the facial hair." Owens identified the man in the photograph as the perpetrator and the Honda Accord as his vehicle. Barwick-Jones testified that Green was the person depicted in the photograph. Owens also identified Green as the perpetrator at trial, noting that he had gotten a haircut. The State's evidence, if believed, was sufficient to prove that Green was the individual who committed the aggravated burglary.

{¶ 64} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. The State's evidence, particularly Owens's testimony, supported a conclusion that Green, by force, entered Owens's home through a window, threatened her with physical harm, and stole money. However, the jury heard that Owens identified Green as the perpetrator, 16 days after the offense, based on a single photograph of a suspect and a single photograph of a vehicle. Barwick-Jones testified that Green was with her (and not at

Owens's home) on November 17 when the offense occurred. However, the prosecutor challenged the credibility of that testimony during cross-examination.

{¶ 65} It was the province of the jury, as the trier of fact, to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Green had committed aggravated burglary. Upon review of the evidence at trial, we cannot conclude that jury lost its way when it credited Owens's testimony and found Green guilty of the aggravated burglary.

{¶ 66} Green's second assignment of error is overruled.

### III. Other Acts Evidence

{¶ 67} In his third assignment of error, Green claims that he "was denied a right to a fair trial because the trial court erred in allowing other acts evidence to be introduced by Detective Colvin."

{¶ 68} As recently stated by the Ohio Supreme Court:

"A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime." That philosophy is premised on our understanding of human nature: the typical juror is prone to "much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime."

This common-law principle is embodied in Evid.R. 404(B).

(Citations omitted.) *State v. Hartman*, Ohio Slip Opinion No. 2020-Ohio-4440, __ N.E.3d

__, ¶ 20-21.

{¶ 69} Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Ohio Supreme Court has discussed Evid.R. 404, stating:

> [Evid.R. 404] contemplates acts that may or may not be similar to the crime at issue. If the other act is offered for some relevant purpose other than to show character and propensity to commit crime, such as one of the purposes in the listing, the other act may be admissible. Another consideration permitting the admission of certain other-acts evidence is whether the other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment" and are "inextricably related" to the crime.

(Citations omitted.) *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 13.

{¶ 70} "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts. Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Hartman* at ¶ 22.

{¶ 71} The Ohio Supreme Court recently clarified the process for determining whether to admit other-acts evidence. The first step is to consider whether the other acts

evidence is relevant. "In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute." *State v. Smith*, Ohio Slip Opinion No. 2020-Ohio-4441, __ N.E.3d __, ¶ 37, citing *Hartman* at ¶ 26-27. "Thus, courts should begin by evaluating whether the evidence is relevant to a non-character-based issue that is material to the case." *Id.* at ¶ 38. "If the evidence is not premised on improper character inferences and is probative of an issue in the case, the court must then consider whether the evidence's value 'is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.' " *Id.*, quoting Evid.R. 403(A); *Hartman* at ¶ 29.

{¶ 72} A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 73} A week before trial, the State filed a motion of intent to use other acts evidence. The State's motion described the burglary of Owens's home and provided the following information about other relevant acts:

> * * * On November 26th, 2018, Kathleen Leonard contacted the Montgomery County Sheriff's Office when she noticed a young African-American male enter her property. The male seemed to tamper with the garage door. Ms. Leonard photographed both the suspect, and the car that he was driving. She provided those photographs to Detective Bryan

Statzer of the Sheriff's Office. Detective Statzer then provided the photographs to Huber Heights Police. Those photographs are shown to Ms. Owens, who identifies the person in the photographs as the man who broke into her home. Those photographs are then disseminated on the Huber Heights Police Facebook page. Huber Heights receives a call from Whitney King in Tipp City who indicates that same person in the photograph had rang [sic] her doorbell a few days prior. John King then contacts Detective Colvin and informs him that he also found a grey/silver sedan parked up the front from when his doorbell was rung. The suspect remains unnamed until Detective Minnix of the Vandalia Police Department obtains the name of Tajrae Green (Defendant) after he learns that some jewelry taken in a Vandalia burglary had been pawned by Defendant. Detective Minnix compared a photograph of Tajrae Green to the photographs taken by Ms. Leonard. Detective Colvin then finds a silver/grey Honda parked at Defendant's residence.

{¶ 74} The trial court granted the State's motion to offer Evid.R. 404(B) evidence. Using the three-step analysis set forth in *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, the trial court concluded that the evidence that Green rang other doorbells was relevant to show his modus operandi, "that the evidence of Green's acts in relation to arriving at and gaining entrance to residences" was being presented for a legitimate purpose under Evid.R. 404(B), and that the probative value was not outweighed by the danger of unfair prejudice to Green.

{¶ 75} At trial, the State's witnesses consisted of Owens, two officers who

responded to her home, Barwick-Jones, and Detective Colvin. The State did not call officers from other jurisdictions or victims of other offenses. The State acknowledges in its appellate brief that, although its pretrial motion indicated an intention to show that Green "had a modus operandi of driving the silver sedan into neighborhoods and ringing doorbells, that evidence was not introduced at trial."

{¶ 76} The "other acts" evidence at trial revolved around the suggestion that Green was involved in other burglaries. During opening statements, the prosecutor informed the jury, without objection, that Colvin "received some photographs from a detective with the Harrison Township Police Department. And these photographs match the vehicle description given by Ms. Owens, and the suspect description given by Ms. Owens." At that time, the prosecutor did not describe how Colvin came to associate Green's name with the photographs.

{¶ 77} During the State's case-in-chief, Owens testified that Detective Colvin told her that the photos "had been obtained from another place that had a camera ringtone." Owens did not mention that the photographs came from another law enforcement agency or the victim of another crime. Nevertheless, the trial court gave the following limiting instruction:

> Ladies and gentlemen, you just heard some evidence that Det. Colvin received information about other calls to law enforcement. Such evidence has been admitted only for a limited purpose, and was not received, and you may not consider it to prove that the Defendant committed any other crimes. The evidence cannot be considered for any other purpose.

(Tr. at 237.)

{¶ 78} The "other acts" evidence predominantly came in through Detective Colvin. After Detective Colvin testified that he initially did not have any suspects in the burglary of Owens's home, the prosecutor asked him what he does to develop suspects. Colvin responded:

Well, I spoke with Ms. Owens. I questioned her about any unusual incidents that may have happened, any people that may have been in the house or been at the house; that sort of thing. Also, I will reach out to other agencies to see if they have like and similar crimes being committed.

We had previously, before that case, had at least two daytime burglaries similar -- with no one home, but daytime burglaries. I reached out to other agencies, and was also told that there were other incidents similar.

(Tr. 300-301.)

{¶ 79} Colvin later testified that his sergeant received photos from Detective Statzer of the Montgomery County Sheriff's Office. When the prosecutor tried to ask about the circumstances surrounding how the photos were taken, defense counsel objected on hearsay grounds. After a sidebar discussion, the objection was sustained. The prosecutor then limited her questioning to:

Q  Det. Colvin, without getting into the specific details of this other report out of Harrison Township, you obtained these photographs from a detective with Harrison Township?

A  My sergeant did, yes.

Q  Okay. And then your sergeant provided –

A   Transferred –

Q -- these photographs –

A -- them to me, yes.

Q -- to you?

(Tr. at 307.)   The trial court again gave the jury that same limiting instruction that had been given during Owens's testimony.

{¶ 80} Colvin then testified that, after Owens made the photo identification, the photograph of Green (whose identity was still unknown) was placed on the Huber Heights Police Department's Facebook page.   When Colvin testified that he received a call from Detective Minnix, defense counsel objected.   After discussion, the court sustained the objection, stating "As is indicated, what the detective said, which I will not permit, so I would sustain the objection stating the detective told him, but we're not there yet.   He can talk about what he did as a result of the call."   (Tr. at 314.)

{¶ 81} Detective Colvin then provided an answer to the prosecutor's prior question: "Det. Minnix did an investigation, had identified the Defendant and an address where he was staying –."   The court again indicated that it had sustained the objection and that the detective was getting into the details of the communication.   After a sidebar discussion about how the prosecutor should elicit the information about how Colvin received Green's name, the trial then proceeded as follows:

> THE COURT:   Okay. Detective, I sustained the objection.   She's going to
> – [The prosecutor's] going to rephrase the question.   So ladies and
> gentlemen, again, when I sustain an objection, you are not to consider the
> answer for any purpose.   Okay.   Go ahead.

[PROSECUTOR]: Okay.

[BY PROSECUTOR]

Q And did Det. Minnix of the Vandalia Police, did he provide you with the name of Tajrae Green?

A He did.

(Tr. at 317-318.)

{¶ 82} During cross-examination, defense counsel questioned Detective Colvin about what preliminary instructions, if any, had been provided to Owens before the photographs of Green and his vehicle were shown to her. During that questioning, the following exchange occurred:

Q Now you have training in showing photospreads and identification photos to witnesses, correct?

A Yes.

Q And I think you testified about instructions that are given to individuals when photos are shown, correct?

A Correct.

Q And what are those instructions?

A View the photographs; hairstyles, beards, and mustaches may easily be changed. Don't -- the pictures don't always depict the true complexion of a person; that sort of thing.

Q And in fact, you tell the person that the person that is a suspect or was in your house, may or may not be depicted in the photograph?

A Correct.

Q   Did you tell Ms. Owens that?

A   No, I told her that I had some photographs I wanted her to view.   I may -- I believe I may have even said that that it may or may not be the person.   *At that point, the physical description matched.   And like you said, there may be a thousand people with the same description out there.   Okay?   But connected with the vehicle, it was a good possibility that was our suspect who was committing all these daytime burglaries.*   In order --

[DEFENSE COUNSEL]: Your Honor, I'm going to object.

May counsel approach?

THE COURT: *I sustain the objection.*

*The reference to the other daytime burglaries will be stricken and you will disregard that.   You will not consider that.*

(Emphasis added.) (Tr. at 330-331.)

{¶ 83} The record clearly shows that the trial court did not allow improper other acts evidence.   The trial court sustained defense counsel's objections to references that Green may have been associated with other daytime burglaries in the area, and it gave the jury instructions to disregard that testimony.   The court also gave limiting instructions regarding the evidence that Detective Colvin had received information about other calls to law enforcement.

{¶ 84} The State asserts that Detective Colvin's admitted testimony properly was limited to how the detective obtained the photographs and how he learned of Green's identity.   The State notes that law enforcement officers may testify to out-of-court statements for the non-hearsay purpose of explaining the next investigatory step.   *State*

*v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 172, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 186.   Testimony to explain police conduct is admissible as non-hearsay if it satisfies three criteria: (1) the conduct to be explained is relevant, equivocal, and contemporaneous with the statements, (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) the statements do not connect the accused with the crime charged. *Id.*; *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27.

{¶ 85} We recognize that police officers often are permitted to testify about how they obtained a lead in their investigations.   In this case, we question the relevance of the source of the photographs of Green and of the source of the identity of Green from the photograph (i.e., law enforcement agencies).   Moreover, although Detective Colvin's statements that he received the two photographs from Detective Statzer and that he learned of Green's name from Detective Minnix were received for the non-hearsay purpose of explaining steps in Colvin's investigation, there is a strong argument that the probative value of that information was substantially outweighed by the danger of unfair prejudice, particularly given that State's case hinged in large part on jury's evaluation of Owens's identification of Green.

{¶ 86} The State further emphasizes, however, that the court gave appropriate instructions regarding the detective's statements.   When evidence which is admissible as to one party or for one purpose, but not admissible as to another party or for another purpose, is admitted, the court, upon request of a party, must give a limiting instruction, restricting the evidence to its proper scope.   *See* Evid.R. 105.   Curative instructions are

given as a means of remedying errors or irregularities that occur during trial. *State v. Artis*, 2019-Ohio-2070, 137 N.E.3d 587, ¶ 50 (3d Dist.).

**{¶ 87}** We generally presume that a jury will follow the trial court's limiting instructions concerning the evidence that may be considered and for what purpose, as well as curative instructions to disregard testimony. *E.g., State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 93; *State v. Herring*, 94 Ohio St.3d 246, 254, 762 N.E.2d 940 (2002); *State v. Bendolph*, 2018-Ohio-1729, 111 N.E.3d 872, ¶ 51 (2d Dist.). "The presumption that curative instructions remedy a mistake * * * can be rebutted by showing that the evidence could not have been ignored and that serious prejudice likely occurred." *State v. McMiller*, 8th Dist. Cuyahoga No. 103962, 2016-Ohio-5844, ¶ 48, citing *United States v. Gonzales-Vazquez*, 219 F.3d 37, 48 (1st Cir.2000).

**{¶ 88}** Here, the court twice provided a limiting instruction during the presentation of witnesses, telling the jury not to consider Detective Colvin's statements to prove that Green committed other crimes. In its jury instructions following closing arguments, the court slightly modified that instruction to read that the jury should not consider the information "to prove that the Defendant committed *any* crimes." (Emphasis added.) (The prior instruction had said "any other" crimes.) With the record before us, we presume that the jury followed the trial court's limiting instructions. We note that the Ohio Supreme Court recently advised trial courts, going forward, to "explain, in plain language, the purposes for which the other acts may and may not be considered." *Hartman*, Ohio Slip Opinion No. 2020-Ohio-4440, ___ N.E.3d ___, ¶ 70.

**{¶ 89}** Of primary concern is Detective Colvin's testimony that he reached out to other law enforcement organizations "to see if they have like and similar crimes being

committed," and that given Owens's physical description of the perpetrator of her burglary plus the vehicle, "it was a good possibility that [the photograph of Green] was our suspect who was committing all these daytime burglaries." The only apparent purpose for this information was to instill in the mind of the jury that Green had committed other burglaries, making it more likely that he had burglarized Owens's home, too.

{¶ 90} The only evidence against Green in this case was Owens's identification. There were no other eyewitnesses, no surveillance videos, no fingerprint or DNA evidence, or any other evidence linking Green to the offense. The State presented no evidence that Green had a particular modus operandi and that his method of committing the burglary of Owens's home was consistent with a particular methodology. In the absence of any evidence corroborating Owens's identification, Detective Colvin's statement that it was likely that Green was the person "committing all these daytime burglaries" created a risk that the jury would give additional credence to Owens's identification based on Colvin's comments.

{¶ 91} The court instructed the jury to disregard these statements. As stated above, we generally presume that the jury follows the trial court's curative instructions. In addition, on the record before us, we cannot conclude that the presumption regarding curative instructions has been overcome. The detective's statements were not so inflammatory that they could not be ignored. *Contrast State v. Sinkfield*, 2d Dist. Montgomery No. 16277, 1998 WL 677413 (Oct. 2, 1998) (detective's statement that defendant had previously tried to kill police officers was not cured by curative instruction).

{¶ 92} Green's third assignment of error is overruled.

### IV. Alibi Instruction

{¶ 93} In his fourth assignment of error, Green claims that the trial court should have given a jury instruction on alibi, sua sponte, even though Green did not file a notice of alibi or request such an instruction.

{¶ 94} Crim.R. 12.1 requires a defendant to file a notice of alibi if he or she proposes to offer alibi evidence.   It states:

> Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted.

{¶ 95} If a defendant fails to submit a notice of alibi, as required by Crim.R. 12.1, the court can exclude the alibi evidence.   *See State v. Hillman*, 2014-Ohio-5760, 26 N.E.3d 1236, ¶ 24 (10th Dist.).   "Where a defendant files a timely notice of alibi, presents evidence to support the contention, and relies on alibi as the sole defense, the trial court has a statutory duty pursuant to R.C. 2945.11 to charge the jury on alibi, whether or not defendant requests such an instruction." *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, ¶ 106, citing *State v. Frost*, 164 Ohio App.3d 61, 2005-Ohio-5510, 841 N.E.2d 336 (2d Dist.) and *State v. McDade*, 2d Dist. Montgomery No. 14339, 1995 WL 9453, *1 (Jan. 11, 1995).

{¶ 96} "Jury instructions are critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. A trial court is required to "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. Requested jury instructions "must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181, 657 N.E.2d 503 (1995), citing *Cincinnati v. Epperson*, 20 Ohio St.2d 59, 253 N.E.2d 785 (1969), paragraph one of the syllabus.

{¶ 97} In this case, Crim.R. 12.1 has no applicability, because there is nothing in the record to suggest that Green intended to raise an alibi defense at trial. The evidence regarding alibi came from Barwick-Jones, a State's witness, not from the defense.

{¶ 98} Green did not request an alibi instruction nor did he object to the trial court's failure to give an instruction on alibi. As a result, Green has waived all but plain error regarding the jury instructions. *State v. Grant*, 2d Dist. Darke No. 2019-CA-13, 2020-Ohio-3055, ¶ 14; *see* Crim.R. 30(A) ("On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."). In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected Green's substantial rights. *See State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372

N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45.

{¶ 99} We find no plain error in the trial court's failure to provide, sua sponte, an instruction on alibi. The parties' arguments focused on Owens's identifications of Green and his vehicle. The prosecutor mentioned Barwick-Jones during closing argument only as to Barwick-Jones's testimony that the photo depicted Green; the State did not mention Barwick-Jones in its rebuttal argument. In defense counsel's closing argument, counsel argued that Owens's identifications of Green and the vehicle were weak and that the State failed to present corroborating evidence that Green was the perpetrator. In a single sentence, counsel stated, "Tajrae [Green] was not there," but there was no mention of Barwick-Jones or her alibi-related testimony. The parties' arguments reflected that they did not consider alibi to be a central component of the trial.

{¶ 100} Moreover, as noted by Eighth District, "[i]t is difficult to prove the existence of plain error in the court's failure to give a jury instruction on the alibi. An alibi defense constitutes a complete denial of the charged offense, so it stands on its own against whatever evidence the state produces. Because '[a] jury instruction on an alibi defense is nothing more than a reminder that the defendant presented evidence of an alibi,' a guilty finding means that the jury necessarily would have rejected the defense." *State v. Coleman*, 8th Dist. Cuyahoga No. 99369, 2013-Ohio-4792, ¶ 15, quoting *State v. Reddy*, 10th Dist. Franklin No. 09AP-868, 2010-Ohio-3892, ¶ 23.

{¶ 101} The jury heard Barwick-Jones's testimony that Green was with her and not at Owens's residence when the alleged aggravated burglary occurred. The jury also heard Owens's testimony identifying Green as the perpetrator. On this record, we

cannot conclude that the failure to provide an instruction on alibi, sua sponte, resulted in a manifest injustice.

{¶ 102} Green's fourth assignment of error is overruled.

## V. Cumulative Error

{¶ 103} In his fifth assignment of error, Green claims that cumulative errors deprived him of a fair trial. Green argues that the trial court should have suppressed Owens's pretrial identification and that the detective's testimony as to Green's involvement with other burglaries was prejudicial and deprived him of a fair trial.

{¶ 104} The cumulative error doctrine provides that a conviction may be reversed "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial[,] even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995); *see State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 129. In this case, the trial court did not err in denying Green's motion to suppress the pretrial identification. Although the detective made isolated statements alluding to Green's being a suspect in other burglaries, upon review of the record, we cannot conclude that Green failed to receive a fair trial.

{¶ 105} Green's fifth assignment of error is overruled.

## VI. Sentencing

{¶ 106} In his sixth assignment of error, Green claims that the trial court did not consider the appropriate sentencing factors in imposing a ten-year sentence. Green notes that the trial court did not state that it had considered the purposes and principles of sentencing under R.C. 2929.11, the seriousness and recidivism factors under R.C.

2929.12, and the objective to use minimum sanctions to accomplish those purposes.

{¶ 107} In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *State v. Huffman*, 2d Dist. Miami No. 2016-CA-16, 2017-Ohio-4097, ¶ 6.

{¶ 108} "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 109} R.C. 2929.11 requires trial courts to be guided by the overriding purposes of felony sentencing. Those purposes are "to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). The court must "consider the need for incapacitating the

offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.* R.C. 2929.11(B) further provides that "[a] sentence imposed for a felony shall be reasonably calculated to achieve the three overriding purposes of felony sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

{¶ 110} R.C. 2929.12(B) sets forth nine factors indicating that an offender's conduct is more serious than conduct normally constituting the offense; R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious than conduct normally constituting the offense. R.C. 2929.12(D) and (E) each lists five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes. Finally, R.C. 2929.12(F) requires the sentencing court to consider the offender's military service record, if any.

{¶ 111} At the beginning of the sentencing hearing, the court indicated that it had reviewed the presentence investigation report, defense counsel's and the State's sentencing memoranda, letters from Green and another individual, and the victim impact statement. The court provided the prosecutor, defense counsel, Green, and Owens an opportunity to speak; all opted to rely on their written statements. Although the court's 10-year sentence was severe, the court's sentence was within the statutory sentencing range for a first-degree felony, and there is no indication in the record that the trial court failed to consider the appropriate factors in sentencing. Accordingly, we presume that the trial court followed the appropriate guidelines for sentencing. *See State v. Ashe*, 2d

Dist. Montgomery No. 26528, 2016-Ohio-136, ¶ 44.

{¶ 112} Green's sixth assignment of error is overruled.

## VII. Conclusion

{¶ 113}  The trial court's judgment will be affirmed.

. . . . . . . . . . . . .


TUCKER, P.J. and DONOVAN, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Lucas W. Wilder
Hon. Michael W. Krumholtz